Argued 15 July; decided 4 August, 1902.

## PARKER *v.* PAGE.

[69 Pac. 822.]

LEASE—EFFECT OF HOLDING OVER.

1. Where there has been a leasing for a year, or for a term of years, and the tenant holds over after the expiration of the term without objection from the landlord, the relation becomes a tenancy from year to year upon the terms and conditions contained in the original lease.

CONTINUATION OF LEASE—LIABILITY FOR IMPROVEMENTS.

2. Where a lease provided that "in case this lease cannot be continued after the expiration of * * by mutual agreement of the parties thereto, then the improvements * * shall be purchased" by the lessor, the lease was "continued" by the action of the parties in respectively paying and accepting the reserved rent after the expiration of the term limited, and the lessee thereby forfeited his right to be paid for the improvements.

From Clatsop: THOMAS A. MCBRIDE, Judge.

This is an action by H. B. Parker against Chas. H. Page and James Brown, as executors, to recover upon an alleged breach of contract. On May 5, 1887, E. C. Crow leased to plaintiff lots 3 and 4, block 7, in McClure's Astoria, and the water front adjacent thereto, for the term of 10 years, from August 1, 1887, at a monthly rental of $25, payable in advance, for each month during the term, by an agreement in writing containing the following stipulations, among others:

"And in case this lease cannot be continued after the expiration of said ten years by mutual agreement of the parties thereto, then the substantial and suitable improvements, such as wharves or warehouses, or both, that shall have been constructed by said Parker or his assigns, and shall be remaining on said lots or water front at such expiration of this lease, shall be purchased by said Crow or his assigns, of said Parker or his assigns, at a fair valuation, to be determined by arbitration in the usual manner in case the parties hereto cannot agree thereto. * * And said Parker, party of the second part, hereby engages and agrees * * to surrender the same to E. C. Crow or his assigns at the termination of this lease, or of any continuation thereof, with the improvements."

The complaint sets forth the execution of the lease, the above conditions, and the construction upon the premises of a wharf and warehouse, and their present value, and, as grounds for recovery, alleges that, at the time of termination of said lease, plaintiff called upon Crow for a renewal thereof, but, he being physically and mentally unable to attend to business, application was made to his attorney and agent, who refused to renew the same, saying that there was no money on hand with which to settle for the improvements, and further stating that the matter would be attended to, but no settlement was ever arrived at, and that Crow and his representatives, the defendants herein, refused to renew the said lease or pay the value of said improvements. The defense interposed was that the lease had been continued by agreement of the parties, in conformity to the stipulation, and, therefore, that Crow's estate was not liable for the improvements. E. C. Crow died testate, April 11, 1899, and on the 20th the defendants were appointed executors of his will.

Parker testified in substance that he saw Crow at Knappa about a year before his death, which was before the lease expired; that he then wanted to make some improvements on the wharf, and to get the lease renewed, and that was the only time he spoke to the deceased about such renewal; that a short time before Crow died, but after the lease had expired, he went to see him. again, but found him in such a condition that he could not talk about the matter, whereupon he went to see Mr. Page, who, with Mr. Brown, had been appointed to look after the estate, and spoke to him about renewing the lease, but that Page urged him to keep it longer, and said that it was "all right"; that the terms of the lease would be all right; to keep it along until they could get some money, and they would settle; that they had no money, and would have to sell some of the property, and obtain it in that way; that they did not want to extend the lease or give a new one, because it would tie up the property, and they would not be able to sell, as it was their purpose, the estate being involved a good deal in debt; that he saw Page a time or two after Crow's death with the same result; that he asked leave to make improvements on the premises without regard to the lease, and let the rent run on from month to month, but he would not allow any improvements to be made, because he thought it would be settled in a few days; that Crow and he were old friends, and he continued to keep the place, and as long as he could get along he kept it, and rented it to other parties, and kept it on that account more as an accommodation than anything else; that after Crow died he went to see Mr. Powers and Mrs. Cullon, Crow's heirs, and they urged him to keep it longer; that he wanted a lease, and talked with Brown about it, who said that it would all be fixed up after awhile. It is further shown that plaintiff continued to pay the specified rental to Crow and his executors for something like two years after the expiration of the lease; that on February 9, 1898, he sublet to Borthwick, and collected rent from him, which he paid to Crow and his executors; that plaintiff finally stopped payment of rent, and, upon notice to quit, surrendered the property in obedience thereto. The plaintiff having rested his case, the court, on motion of defendants, directed the

jury to return a verdict in their favor, which having been done a judgment of involuntary nonsuit was entered against the plaintiff, from which he appeals.                                    AFFIRMED.

For appellant there was a brief over the names of *John Q. A. Bowlby* and *Fulton Bros.*, with an oral argument by *Mr. Charles W. Fulton.*

For respondents there was a brief over the names of *George Noland* and *John H. & A. M. Smith*, with an oral argument by *Mr. Noland* and *Mr. John H. Smith.*

MR. JUSTICE WOLVERTON, after stating the facts, delivered the opinion of the court.

The complaint is based upon the theory of a refusal upon the part of Crow and his executors, at the expiration of the term, to renew the lease for a like term of 10 years. Parker saw Crow but once, however, with reference to the lease, which was about a year prior to his death, and more than four months prior to the expiration thereof; and although he testified that he wanted to make some improvements, and get the lease renewed, it is not developed what Crow said or agreed to at that time, or whether or not he encouraged plaintiff to believe that he would accede to his wishes, or flatly refused him. In other words, the result of the conference is in no way made to appear, and it is not shown that the parties came to any understanding whatever in modification of or in respect to the agreement then in force. There appears to have been no other effort on the part of Parker to adjust the matter until after the expiration of the lease; the next being, as he said, a little before Crow's death, who being unable to talk about the matter, the conference was had with Page, who had been appointed to look after his business. Other efforts followed, after this, with the executors and heirs of the deceased, and all with the same result,—that no agreement was arrived at,—and in the meanwhile plaintiff continued in possession, and paid the rent, as before, and Crow and his representa-

tives continued to accept the same without disturbing him in the enjoyment of the premises.

1. The old and strict rule of the common law that whatever annexations were made to real property by a tenant became a part of the realty, and could only be severed by the consent of the landlord, has been much relaxed to meet the requirements of manufacturing enterprises and trade relations (Wood, Landl. & T., § 526; *Alberson* v. *Elk Creek Min. Co.,* 39 Or. 554, 65 Pac. 978) ; but the present case is in no way affected by it, as it was, by the intendment of the agreement, evidently the purpose of the parties that the improvements in question were to become inseparably annexed to the realty, but that the landlord should pay the tenant for them in case the lease could not be continued, after the expiration of the term, by mutual agreement of the parties: *Kutter* v. *Smith,* 69 U. S. (2 Wall.) 491. By the very great weight of American authority, where there has been a leasing for a year, or for a term of years, and a holding over after the term with the tacit acquiescence of the landlord, the relationship and agreement of the parties is converted into a technical tenancy from year to year. This result springs from the act of the tenant in holding after the term, by which he becomes a trespasser, and the landlord's recognition of his lawful right to continue, by which the tort is waived; and the law implies a contract of further leasing—that is, from year to year —upon the same terms and conditions contained in the expired lease. It is optional with the landlord whether to treat the continued holding as a trespass or to regard the act of the tenant as lawful, and the tenant has no alternative but to abide his determination; but, when the landlord has once made his election by recognition of the tenancy, he cannot thereafter deny the relationship: Wood, Landl. & T., § 13; 18 Am. & Eng. Enc. Law (2 ed.), 407. Such is the solicitude that the rule should be certain in its effect and operation that the courts adopting it have quite uniformly implied the contractual relationship of a tenancy from year to year even where the holding over is slight, and the landlord has either expressly or by implication elected to treat it as lawful: *Delashman* v. *Berry,* 20 Mich. 292 (4 Am. Rep.

392) ; *Mason* v. *Wierengo's Estate,* 113 Mich. 151 (71 N. W. 489, 67 Am. St. Rep. 461; *Peehl* v. *Bumbalek,* 99 Wis. 62 (74 N. W. 545) ; *Conway* v. *Starkweather,* 1 Denio, 113; *Adams* v. *City of Cohoes,* 127 N. Y. 175 (28 N. E. 25) ; *Haynes* v. *Aldrich,* 133 N. Y. 287 (31 N. E. 94, 28 Am. St. Rep. 636) ; *Cavanaugh* v. *Clinch,* 88 Ga. 610 (15 S. E. 673) ; *Wolffe* v. *Wolff,* 69 Ala. 549 (44 Am. Rep. 526) ; *Bradley* v. *Slater,* 50 Neb. 682 (70 N. W. 258) ; *Smith* v. *Snyder,* 168 Pa. 541 (32 Atl. 64) ; *Clinton Wire Cloth Co.* v. *Gardner,* 99 Ill. 151.

2. It is urged, however, that the law creates the tenancy,— that is, implies the agreement from the acts of the parties,—and that it lacks the characteristics of a mutual agreement, such as was contemplated by the parties, the failure of which would make it incumbent upon the lessor to pay for the improvements. Mr. Chief Justice Bean, in *Twiss* v. *Boehmer,* 39 Or. 359, 362 (65 Pac. 18), says: "The relation of landlord and tenant exists by virtue of a contract, express or implied, and, to constitute such a relationship, there must be an occupancy of the premises in subordination to the title of the lessor, and with his permission, express or implied." Now the contract is none the less mutual because it is implied, and the correlative obligations are just as binding in the one case as in the other. True, the tenant's continued holding is primarily a trespass, but the law will not permit him to gain any advantage because of his wrongdoing. Of this wholesome rule he is charged with knowledge. He is also charged with knowledge of the fact that, if he continues in possession without some different agreement respecting his holding, the landlord may then treat him as a tenant, whether he desires such relation or not. So that when a tenant holds over after his term of one or more years, although he commits a trespass in so doing, it is tantamount to an offer on his part to the landlord to continue the same relationship, but only from year to year; and when the landlord accepts the offer, which may be by implied or express assent, there is, in legal parlance, a meeting of the minds for all intents and purposes. It is said that the law raises the contract, but the parties necessarily act in view of the law; and whenever they put themselves in a condition or

position that the law will make for them a compact with correlative obligations, which they cannot disregard without incurring liability, there springs a mutuality, a meeting of the minds, as much as though there was express assent on both sides to the contractual relations.   For a more elaborate discussion of the subject, see opinion of EARL, C., in *Schuyler* v. *Smith,* 51 N. Y. 309 (10 Am. Rep. 609), where the same result was reached. So we conclude here that, as to plaintiff, his continuance in possession without any different agreement as to the leasing than that which was entered into May 5, 1887, was tantamount to a proffer to Crow to create a tenancy from year to year, and when Crow accepted the rent, and allowed him to continue without objection, the minds of the parties were as one, and there was henceforth a mutuality, and a complete agreement by which there was a continued leasing.   Under the terms of the original lease, it was left absolutely to the option of the plaintiff whether he would agree to a continuance of the relationship with Crow.   If he had declined to continue it, and surrendered possession at the end of the term, there would have been but one thing for Crow to do, and that would be to pay the value of the improvements. But, instead of taking this course, he continued in possession, and, the law charging him with full knowledge of the effect of his act in so doing, the new tenancy from year to year has been established through his own volition.

It is further insisted that the plaintiff remained in possession pursuant to an agreement that his so holding over was not to be construed as a waiver of his claim for the value of the improvements.   The testimony, however, has no tendency to the establishment of such an agreement.   The only conference Parker had with Crow with reference to the lease was, as we have seen, about a year prior to his death, but it is not shown that they came to any or different understanding then; and, without more, Parker continued in possession after the term, paid his rent, and the same was accepted, and so it continued for about two years or more.   Other efforts to arrive at a settlement were had with the executors, but no such efforts appear to have been made until after the expiration of the lease, and it is probable that at the

time the new relations had been formed. Whether they were or not, the testimony excludes the possibility of any agreement that the holding over should not constitute or operate as a waiver of the claim for improvements, and the most that can be deduced from their several conferences is that the parties were endeavoring to readjust their relationship, which involved as well the matter of the improvements, but they were utterly unable at any time to arrive at any definite or ultimate agreement respecting the same, or to accomplish a settlement of their differences.

It is further urged that the term "continued" by intendment of the parties means "renewed," and should be so read in the lease, and, thus read, it signifies a renewal of the original term of 10 years. This would be a strained and unnatural construction of the term, as in its ordinary sense it has appropriate application in the connection in which it is employed. The lease is essentially continued under a tenancy from year to year. In either event, there could be no holding absolutely under the old lease. The relationship would be continued by a holding over, thereby creating a tenancy from year to year, as well as by a renewal, which would be the creation of a new term; so that the word "continued," in its ordinary signification, is appropriate in characterizing any continuance which may be had by mutual agreement of the parties; and we must give it that meaning here. The context or a construction of the agreement by the four corners calls for none other. In arriving at this conclusion, we have not overlooked the case of *Phillips* v. *Reynolds,* 20 Wash. 374 (55 Pac. 316, 72 Am. St. Rep. 107). In that case, however, the lessors agreed that at the expiration of the term they would buy the buildings or extend the lease. They attempted to relieve themselves of the obligation by granting an extension for one day, and the court very properly said the act was not within the purview of the contract, and, construing it as a whole, declared that by the intendment of the parties there should be a renewal for another term of twelve years. The lessors would not so much as afford the opportunity of a tenancy from year to year, and arbitrarily fixed a nominal limit for a new term; so that there is no such analogy between that case and this as to establish a

precedent for our construction of the present lease. Upon the evidence adduced, the plaintiff was not entitled to recover. But it is contended, however, that the court erred in directing a verdict for defendants. Without discussing the matter further, suffice it to say that the defendants took a judgment of nonsuit, and of this the plaintiff cannot complain. The judgment of the court below is therefore affirmed.	AFFIRMED.

Decided 10 March; rehearing denied 26 May, 1902.