Decided 5 August, 1901.

## ALBERSON *v.* ELK CREEK MINING COMPANY.

[ 65 Pac. 978.]

TRIAL—DISPUTED QUESTIONS OF FACT.

1. Where evidence on a material point is conflicting the jury are the proper persons to determine the fact.

CHATTELS—TRADE FIXTURES—ANNEXATION TO REALTY.

2. The strict rule that whatever is affixed to the soil becomes part of the realty has been much relaxed in favor of trade and modern business require-ments, and in many instances the personal quality of the chattel is retained even though there be an appreciable annexation; thus, under an option contract for the purchase of a mine, the purchasers were to take possession and develop the mine, until they should either buy it or surrender possession. Such purchasers gave a mortgage on personalty which they attached to the mine for its develop-ment, and which was so placed that it could be removed if the option to purchase was not exercised. The option was exercised, but the purchasers subsequently forfeited the mine to the owners. The mortgage on such personalty was executed prior to exercising the option to purchase and recorded after the option had been accepted but before the forfeiture to and repossession by the owners. *Held*, that such purchasers were entitled to remove such fixtures as were placed on the mine for the temporary purpose of testing its value, and had the right to treat them as personalty, and to mortgage them, and that, on the subsequent forfeiture, the owners and their subsequent grantees took the property subject to the chattel mortgage: *Landigan* v. *Mayer*, 32 Or. 245, applied.

ANNEXATION OF CHATTELS—IMPORTANCE OF INTENTION.

3. In determining whether a chattel has become part of the realty on which it has been placed, the intention of the party who put it there is an important factor to be ascertained; and in so doing all the acts of such party must be considered, since those are assumed to be the outward manifestations of the mental process within.

MORTGAGE OF CHATTELS AFFIXED TO REALTY BY INTENDING BUYER.

4. Where a prospective purchaser of realty who is in possession under an option to purchase, places on the property trade chattels which are not necessarily intended to be permanent, and gives a chattel mortgage on them before exercising the right to purchase, the subsequent relinquishment of the property to the vendors with the chattels thereon does not affect the right of the chattel mortgagee.

EVIDENCE ON CONCEDED POINT.

5. It is not error to exclude evidence on a matter conceded, for manifestly no one can be injured thereby.

INSTRUCTING JURY—QUESTION OF FACT.

6. Where, on an issue as to whether personalty was converted into realty, matters of fact are involved pertinent for the jury, the court can not instruct that what was done was, as a matter of law, a conversion.

REPLEVIN—SUFFICIENCY OF DESCRIPTION.

7. Where property sought to be recovered as personalty had been built into a tramway, the description of it as "steel rails, spikes, bolts," etc., is sufficient, as it is only necessary to describe it so that it may be determined what property is involved.

EVIDENCE OF INTENTION TO AFFIX CHATTELS TO REALTY.

8. In ascertaining whether personalty placed on real property has been thereby converted into realty, the fact that it was placed there by one who had an option to purchase, for the purpose of improving or developing the property, and with an intention of buying, is not conclusive evidence of an intention to make the chattel a permanent accession to the freehold.

From Union :  ROBERT EAKIN, Judge.

Action of replevin by J. L. Alberson against the Elk Creek Gold Mining Company to recover possession of sundry chattels that he might foreclose a chattel mortgage thereon.   The facts in detail appear in the opinion of the court.   Defendant appeals from a judgment for the plaintiff.                                    AFFIRMED.

For appellant there was a brief and an oral argument by *Mr. Thos. H. Crawford.*

For respondent there was a brief and an oral argument by *Mr. J. M. Carroll.*

MR. JUSTICE WOLVERTON delivered the opinion.

W. T. Wright, J. C. Moreland, and J. T. Wright, being the owners of a mine known as the "Robert Emmet Quartz Lode," entered into an agreement with John H. and Frank J. Davey, August 8, 1899, by the terms of which they executed a deed thereto in favor of the Daveys, and placed the same in escrow, to be delivered to them upon condition that they enter into possession thereof, do certain development work, and make such improvements as they might deem necessary to put it in a producing condition; they to elect whether they would purchase the same, and accept the deed, within six months. It was further agreed that, in case the Daveys should elect to purchase, they would pay therefor $5,000 in cash, and execute four promissory notes for $5,000 each, payable three, six, nine, and twelve months from February 8, 1900, the deed to remain in escrow until all notes were fully paid; but that, in case of default in payment of any of them, or any part of either, time being made of the essence of the contract, they were to forfeit all their rights in and to the mine, and all moneys theretofore paid. It was also agreed that the Daveys should pay for all supplies furnished and labor done on said mine, not allow any lien to be placed thereon, and should save the owners harmless from any and all liens for labor or supplies of any kind and nature upon the mine; and that, in case they should elect not to take the mine under the option, they should immediately surrender the same. After entering into possession, the Daveys purchased of the plaintiff certain property, which was subsequently included in their chattel mortgage to him, consisting of eleven thousand two hundred and fifty pounds of steel rails, four hundred pounds spikes, three hundred and twelve pounds fish plates, thirty-four and one half

pounds bolts, two ore cars, two half-inch wire cables four hundred feet long, break station, ore bins, and other material for the tramway, one Montgomery whim, with two ore buckets and one set of trucks, and sundry tools and supplies. With this material they constructed a complete system for hoisting and conveying ore from the mine and depositing it in the bins. The whim is situated at the shaft, rests upon a timber foundation, is attached to and connected with the shaft house, and is utilized, with the wire cable, buckets, and trucks, in hoisting the ore from the mine. The steel rails form a tramway or car track extending one thousand and twenty feet from the shaft on a level to the break station, thence four hundred and twenty feet down an incline to the ore bins. They are spiked to wooden ties resting upon the ground, and the fish plates and bolts serve to connect them. The break station is built of timbers, and consists of a drum resting upon a substantial foundation, over which a wire rope or cable runs, and is utilized to draw the cars along the incline to and from the ore bins. The bins are constructed of timbers and plank, and the cars are used upon the tramway for transporting the ore, which is dumped into them from the buckets at the whim, to the break station, and thence to the ore bins. This action is to recover the possession of the said personal property. It is alleged in the complaint that John H. and Frank J. Davey, on February 1, 1900, executed and delivered to the plaintiff a chattel mortgage thereon, which was duly filed and recorded March 20, 1900, and his right to the possession is founded upon this mortgage. The defendant claims title by virtue of a conveyance by deed from W. T. Wright and J. C. Moreland of an undivided thirteen sixteenths of the mine, with its appurtenances. Judgment was for the plaintiff, and the defendant appeals.

When the plaintiff submitted his evidence and rested, the defendant moved for a nonsuit, which was denied, and the principal controversy is as to whether the court committed an error in so doing. There was evidence tending to show that the Daveys purchased the larger portion of the property from the plaintiff, and, being indebted to him in the sum of $690.73, gave him the chattel mortgage to secure its payment, bearing at the left-hand margin, opposite, but a little below, the signatures, the date "Feb. 1, 1900." It is shown by a certificate of John M. Gilkison, County Recorder of Union County, that it was recorded March 20 following. This instrument, and the note evidencing the indebtedness, payable in forty-five days after date, were offered and admitted in evidence. In this state of the record, the plaintiff testified as follows: "I went to Mr. Davey [Frank J.], and told him that the note was due, and I wanted the money; that I wanted to get it settled up, or I wanted the property. Then he told me that the property was mine, and I could come and take it at any time. Shortly after that he made me the mortgage. I don't just remember the date when I went to him and demanded the property, and he turned it over to me." He fixes the date as being directly after the note became due, or "some time about the first of April," and says that the property was afterwards taken from his possession by the defendant. He further testifies that he exercised ownership over the property by giving C. E. Davis, a director of the defendant, permission to run some hay over the tramway, and locking up the whim, and that immediately thereafter the defendant took possession; that some time in May he told Davis that he had a bill of sale of the property, referring to the chattel mortgage, which he showed him. There was further evidence tending to show that Davis had notice of its existence.

Frank J. Davey testified that he had turned the mort-
gaged property over to the plaintiff some time in April;
that the property was placed upon the mine for the pur-
pose of developing it, doing developing work under the
option; that "it was placed there in a temporary manner
at the time, in such manner that it could be removed if
we decided not to exercise the option;" that the whim
has been moved three or four times; that the property
could be removed without detracting from the value of
the realty; that it is used for the extraction of the ore
from the mine, and, when that is accomplished, there will
be no further use for it; that they accepted the option to
purchase on the seventh day of February, 1900; that
they executed the mortgage to plaintiff prior to that time
namely, on the first day of February; that they subse-
quently forfeited the mine, and it went back to the origi-
nal parties from whom they had taken the option; and
that, when they turned the personal property over to the
plaintiff, they did it to satisfy the debt.   On cross-exami-
nation he further testified that the property was put on
the mine to be used in getting the ore out, to see if the
mine would pay, and to develop the property.   John T.
Wright, one of the original owners, testified that the
Daveys forfeited the mine under their agreement, and
that when he went to take possession for the owners he
found it in the possession of Lawrence Painter, repre-
senting the owners, "and the personal property that had
been put on the mine" in charge of the same person for
Mr. Alberson; and that he recognized Painter as hold-
ing possession in the dual capacity indicated, made no
objection thereto, and so reported to the other owners.
Painter had been authorized to take charge of the mine
by W. T. Wright, and had been in possession about
twenty-four hours.   Subsequently, W. T. Wright and J.

C. Moreland conveyed the undivided thirteen sixteenths interest to the defendant.

1.   It is first insisted that by reason of plaintiff's statement that he obtained the mortgage shortly after the note became due, which was forty-five days after February 1, and of the fact that it was not filed until March 20, it conclusively appears that it was not executed until about the latter date. It is manifest that the plaintiff became somewhat confused in his statement, and it is not quite clear what idea he intended to convey by the remark alluded to ;  but there was ample evidence to go to the jury indicating that the mortgage was in reality executed and delivered on February 1.   It bears that date, which is itself *prima facie* evidence of the fact, and Frank J. Davey testifies to it directly ;  hence this objection is without merit.

2.   It is next insisted that the property in controversy, being affixed to the mine, became a part of the realty, and therefore insusceptible of incumbrance by a chattel mortgage.   And in this connection it is urged that the Daveys having declared their option, converted their agreement with the Wrights and Moreland into a contract to purchase, and not having reserved this property at that time, it became the property of the mine owners, and went to them under forfeiture, and hence they were not entitled to sever it from the freehold, or to deliver possession to the plaintiff.   Latterly, the strict rule that whatsoever is affixed to the soil partakes of the nature and becomes a part of the realty itself has been much relaxed, to meet the requirements of manufacturing industries and trade relations, so that now the question whether an article of personalty, in its original state, has become a part of the freehold, depends upon three conditions :  annexation, real or constructive ; adapta-

bility to the use or purpose of the realty to which it is
attached ; and the intention of the party making the
annexation to make it a permanent accession to the free-
hold : *Henkle* v. *Dillon*, 15 Or. 610 (17 Pac. 148); *Lan-
digan* v. *Mayer*, 32 Or. 245 (67 Am. St. Rep. 521, 51 Pac.
649); *Tillman* v. *De Lacey*, 80 Ala. 103 ; *Binkley* v. *Fork-
ner*, 117 Ind. 176 (19 N. E. 753, 3 L. R. A. 33). This
rule is without application, however, where, by reason
of the manner of annexation, the chattel loses its identity
or distinctive character as such, and becomes so insepa-
rably a part of the freehold as that it can not be detached
without material injury thereto, or without substantial
impairment of the value of the chattel,—such as the
brick or timber contained in the walls of a building, or
the stones of a foundation upon which the structure is
erected (*Sword* v. *Low*, 122 Ill. 487, 13 N. E. 826) ; other-
wise, the character as a chattel may be maintained as
personalty, although annexed to the realty, and though
it has adaptation to the use to which the realty is sub-
jected by the convention of the parties affected, or by
the intention or purpose of the party making the annex-
ation. In the case at bar there were annexation and
adaptability, so that the question of intention only re-
mains, and that is a mixed question of fact and law.
The fact comprises the intention, and when this is ascer-
tained the law fixes the status : *Allen* v. *Mooney*, 130 Mass.
155 ; *Philadelphia M. & Trust Co*: v. *Miller*, 20 Wash. 607
(56 Pac. 382); *Tillman* v. *De Lacey*, 80 Ala. 103 and 83
Ala. 155 (3 South. 294).

3. We may, in this place, for the purpose of perspi-
cuity, very properly employ the language of KNOWLTON,
J., in *Hopewell Mills* v. *Taunton Sav. Bank*, 150 Mass. 519
(15 Am. St. Rep. 235, 23 N. E. 327, 6 L. R. A. 249),
wherein it is said that "The intention to be sought is

not the undisclosed purpose of the actor, but the intention implied and manifested by his act. It is an intention which settles not merely his own rights, but the rights of others who have or may acquire interests in the property. They can not know his secret purpose; and their rights depend, not upon that, but upon the inferences to be drawn from what is external and visible. In cases of this kind every fact and circumstance should be considered which tends to show what intention, in reference to the relation of the machine to the real estate, is properly imputable to him who put it in position." The jury had to do with the intention, and there was evidence pertinent from which they might reasonably infer that the Daveys had no purpose of permanently annexing the property to the freehold at the time their system of raising and transporting the ore was put in operation. They had not then concluded to purchase, and Frank Davey says that the property was placed into position "in a temporary manner at the time,—in such manner that it could be removed if we decided not to exercise the option;" and, on cross-examination, that the property was put on the mine to assist in getting the ore out to see if the mine would pay, and to assist in developing the property. Then the fact that the chattel mortgage was given shows a treatment of the property in consonance with the idea that the annexation was not designed to be permanent. Nor does the language of the agreement preclude the controversy. The plain interpretation thereof is that the Daveys were to pay for all supplies and labor furnished, and were to save the owners harmless from any and all liens for such labor and supplies. The purpose was to protect the mine from any liens for labor or supplies furnished the Daveys while prosecuting their development work, and after that, if there was any agreement to purchase under the option, while conducting the

mine, until the owners were fully paid, so as to protect their security. There is no stipulation anywhere in the contract that improvements put upon the mine for doing development work in the temporary stage or while the option remained open should be forfeited in case the Daveys should not decide to purchase. They were permitted to make such improvements as they might deem necessary to put the mine in a producing condition ; but this stipulation, read with the context, has more especial reference to driving tunnels, and the like, in developing the mine, and does not necessarily comprise the instrumentalities by which the work was to be carried on. While the option continued, the Daveys were licensees, coupled with an interest, and their position can not be assimilated to that of lessees. They were not subject to eviction by the owners, and hence were entitled to remove such fixtures as were placed upon the mine for the temporary purpose of testing its value, and thereby to enable them to determine whether it would be a good business venture to elect to purchase while the option remained open. There was no express agreement or stipulation between the parties that the Daveys might remove such improvements, but we are of the opinion that, under the conditions prevailing, the law implied one : *Merchants' Nat. Bank* v. *Stanton*, 55 Minn. 211 (56 N. W. 821, 43 Am. St. Rep. 491); *Moore* v. *Vallentine*, 77 N. C. 188.

4. When, however, the option was converted into a contract to purchase, the parties thereto sustained a very different relation ; and it may be conceded for the purposes of this case that the Daveys could not then have removed these improvements. But, having the right to remove the property if they did not intend to attach or annex it permanently to the freehold so as to become a

39 OR.—36.

component part of it while the option remained open, they had the right to treat it as personalty, and to mortgage it, until precluded by their election to purchase. If, therefore, the property went to the owners under the Daveys' election to purchase, and the consequent forfeiture, they took it *cum onere*, its status being fixed, so far as the mortgagee was concerned, prior to the election.

But it is urged that the owners, through the Daveys' election and the forfeiture to them, became purchasers of the property bona fide, and without notice of the existence of the plaintiff's mortgage, and that the defendant mining company, although it had notice of the mortgage, was a purchaser from an innocent purchaser, and therefore it has the better title. The election to purchase was declared February 7. The mortgage, although it may have been executed prior to, was not recorded until, March 20; but the forfeiture was not declared nor possession taken by the owners until May, so that they were charged with constructive notice at that time by the record. Now, going back to the election to purchase, when that was done, the property became a part of the freehold in the status it had then assumed; the owners paid nothing of value for it; and it is difficult to see how a forfeiture could give them the standing of a purchaser in good faith. We are satisfied that it could have no such effect. This answers the appellant's objection, also, to the court's instruction No. 11.

Mr. Wright, while a witness for the defendant, was not permitted to testify as to whether the Daveys made any reservation of this property when they turned the mine back to the owners, and the action of the court in this regard is assigned as error. It is apparent from what has been said that it could make no difference whether they made such a reservation or not. The plaintiff's in-

terest attached long prior to this time, and his lien continues on the property in the possession of the defendant.

5.  Appellant next complains that one Lindgreen was not permitted to testify that the whim was the only instrumentality provided for raising ore .from the lower levels and keeping the mine clear of water ; but the use to which the whim was put was a matter conceded, and the testimony could not strengthen it, so the appellant was not injured by its rejection.

Exceptions were noted to some instructions of the court and the refusal to give others asked, and errors have been predicated thereon.  They all relate to some phase of the inquiry touching the requisite conditions for changing the status of personalty into realty where used in connection with the freehold.  Those given proceed upon correct principles, are in accord with the law as above declared, and are therefore unobjectionable.

6.  Instructions 1, 2, and 6 requested and refused are based upon the theory that the court should instruct, as a matter of law, that by what was done the personalty was converted into realty.  This was not allowable, because matters of fact were involved pertinent for the jury.

7.  No. 3, of the instructions refused, involved the question whether the steel rails, spikes, fish plates, bolts, and wire cable, after they had been built into a tramway, and the cable attached to the whim and break station and buckets and cars, could be recovered by that description without designating it as a tramway, break station, etc.  If this property retained its status as personalty, it was only necessary, in order to maintain the action for its recovery, to so describe it as that it might readily be determined what property was involved in

the controversy.    That this was done must be conceded, and hence the description was sufficient.

8.    Instruction No. 4 of the list so refused is as follows : ''If you find from the evidence in this case that the Daveys placed this property sought to be recovered on the Robert Emmet mine in a substantial manner for the purpose of developing and operating said mine as a mining claim, with the intention of acquiring title thereto under this contract, and that the property and the improvements were suitable and necessary to the development and operation of the mine, then I instruct you that such property, when so placed upon said mine, became a part of the realty, and your verdict should be for the defendant.'' The vice of the instruction consists in making the placing of the property upon the mine, with intention of acquiring title to the same, tantamount to the intention of annexing the personalty to the freehold as a permanent accession.    It does not follow absolutely that, because there was an intention to acquire the realty, there was an intention to annex the personalty, with a purpose of making it a component part of the realty.    Hence this instruction was properly refused.

This disposes of all matters involved by the inquiry, and, being favorable to the plaintiff, the judgment will be affirmed.                                    AFFIRMED.

Decided 5 August;  rehearing denied 7 October, 1901.