Argued October 11, 1961, affirmed January 24, 1962

# STATE HIGHWAY COMMISSION *v.*
## HEWITT ET AL
### 368 P. 2d 346

*William A. Mansfield,* Assistant Attorney General, Salem, argued the cause for appellant. With him on the brief were Robert Y. Thornton, Attorney General, and L. I. Lindas and Charles Peterson, Assistant Attorneys General, Salem.

*Frederic H. Starkweather, Jr.,* Gold Beach, argued the cause and submitted the brief for respondents.

Before McALLISTER, Chief Justice, and ROSSMAN, PERRY, GOODWIN and LUSK, Justices.

ROSSMAN, J.

This is an appeal by the plaintiff from a judgment of the circuit court, based upon a jury's verdict, which was entered in a condemnation action. The plaintiff is the state acting through its Highway Commission. Prior to the institution of the action on May 6, 1960, the defendants, John Hewitt, Jr. and his wife, were the owners of a tract of land approximately 135 acres in extent which lies about nine miles south of Gold Beach in Curry County. The land fronted upon the ocean for virtually a quarter of a mile. The state desired for highway construction purposes a portion of the land slightly more than ten acres in extent. That part abutted upon the ocean; the remaining 125 acres did not. The highway which the state proposed to build and which it has built is of the limited access type and affords neither access to nor egress from the remainder of the land. Since the state took all of the tract which fronted upon the ocean the remainder has access to neither the ocean nor the new

highway. Based upon the jury's verdict in the amount of $9,000 the court entered a judgment that the land should be appropriated to the plaintiff upon the latter's payment to the defendants of $9,000 together with $1,000 which was fixed by the court as attorney's fees.

The plaintiff's complaint alleged that just compensation was in the amount of $1,900. The answer averred, "the true value of the real property being taken and the damages resulting from the taking is the amount of $14,200."

The state, that is, the Highway Commission, submits four assignments of error. They are:

"The trial court erred in entering judgment based on the irregularity in the proceedings, and misconduct of counsel for defendants, which irregularity precluded plaintiff from having a fair trial. The misconduct of counsel occurred as follows: * * *"

"The court erred in overruling the plaintiff's challenge for cause to Mrs. Rita Ganong which challenge, made during *voir dire* examination, and ruling thereon, were as follows: * * *"

"The court erred in overruling the plaintiff's challenge for cause put to Mr. Everett Isenhart, which challenge, made during *voir dire* examination, and ruling thereon, was as follows: * * *"

"The court on *voir dire* examination of prospective juror John Z. Crockett erred in sustaining defendants' objection to the following question: * * *"

The first assignment of error, as we have seen, challenges a ruling of the trial judge which denied the plaintiff's motion for a mistrial. In September 1958, one year and eight months prior to the institution of this action, the defendants, Hewitts, purchased the land in question from Mrs. Henrietta Wickes

Shaw, the widow of David Shaw. The Shaws had acquired it at a time prior thereto which is not disclosed by the record. Upon Mr. Shaw's death the property was offered to the defendants and they purchased it for the sum of $15,000 cash. The Shaws, the defendants and the father of defendant John Hewitt, Jr., had been friends for some years. The defendant John Hewitt, Jr., testified, "We knew them as neighbors and friends." The plaintiff's (appellant's) brief states the issue, presented by this assignment of error, in the following words:

> "The key question which gives rise to this assignment of error was by defendant's counsel in asking if widow Shaw had phoned John Hewitt, Jr., stating that she needed money and wanted to sell the property."

The state's witnesses had indicated that the sale by Mrs. Shaw to the defendants was by a willing but not a necessitous seller. The state contends that the effect of "the key question," to which it objected, was to intimate that Mrs. Shaw, the seller, was driven by necessity when she sold the property.

It will be noticed that more than a year prior to the commencement of this condemnation proceeding the defendants purchased the property in question from Mrs. Shaw and paid for it $15,000. We take the following from the plaintiff's (appellant's) brief:

> "The Shaw to Hewitt sale was an important part of plaintiff's case. The property transferred by the sale was the identical 135 acres which comprise the larger tract in this proceeding and there was no evidence that its condition had changed from the time of the sale to the date of valuation so there was no question as to whether it was similar or 'comparable.' Dallas v. Boise, 44 Or. 302, 75 Pac. 208 (1904).

"The sale was accomplished only one year and eight months before the date of evaluation in this case and there was no evidence of a change in market conditions in the interim so there was no question as to whether it was 'recent' enough to be a valid, usable sale. Douglas County v. Meyers, 201 Or. 59, 268 P.2d 625 (1954)."

Mr. James A. Rodman, Jr., a real estate broker and appraiser, was one of two witnesses called by the plaintiff to establish the value of the property taken and the damage to the remainder. He testified:

"A Well, one of the best comparisons or facts about this property as far as what it was worth prior to the taking was, in my opinion, the sale of the property itself. It sold in September of 1958. I checked the information concerning that sale.

\* \* \*

"Q Did you make an investigation to determine whether that was a fair and open market transaction?

"A I did.

"Q And, did your examination show it to be a fair and open market transaction?

"A It did."

Mr. Neil Boehmer, the other of the state's appraisal witnesses, testified that in arriving at the value of the property he paid attention to the sale from Mrs. Shaw to the defendants. Upon cross examination he testified:

"Q Now, did you investigate whether or not that sale from Mrs. Shaw was made as a forced sale on her part?

"A As I mentioned, well, it was a different sale, but as I mentioned, I attempted to get ahold of Mrs. Shaw, and I was unable to do so.

"Q Do you remember when her husband just recently died?

"A I was aware of it.

"Q Do you know whether or not she required money?"

To the question last quoted the state objected "as possibly implying that Mrs. Shaw did at that time," that is, required money. At that point the presiding judge ruled:

"Those questions are proper only if you intend to bring in evidence to show it."

Thereupon, defendants' counsel withdrew the question.

It will be recalled that the question last quoted and to which the state's counsel objected was a part of the cross examination of the witness. ORS 45.570 states:

"The adverse party may cross-examine the witness as to any matter stated in his direct examination, or connected therewith * * *."

When the defendant, John Hewitt, Jr., was testifying as a witness for the defense he stated that he purchased the property in September of 1958 for the sum of $15,000 cash, and then the examination proceeded as follows:

"Q And, what were the situations of your making that purchase?

"A Well, the Shaws were also neighbors of my father who owned the property to the north, and we knew them as neighbors and friends. We had seen the Shaws, I think, about a year before the sale was made, when Dave was still alive, and they had also, as a matter of fact, my father had made an offer on the northern forty of that acreage.

"Q Well, you don't need to—

"A (Interposing) Well, anyway, we had an agreement, a verbal agreement that if the Shaws were to sell it, they would give us first refusal.

"Q All right. Now, did Mr. Shaw subsequently die?

"A Yes.

"Q Did Mrs. Shaw telephone you and your father to the effect that she needed money?"

At that point the state's counsel took the following course:

"Your Honor, we object to that on the grounds that this witness is not qualified to testify about whether Mrs. Shaw was in distress or not.

"And, further, we would move that it be stricken from the record, and further move for an order instructing the jury to disregard it.

"Further, we move for a mistrial for the record."

When the state's counsel had thus spoken the jury was excused while the presiding judge heard counsel argue the state's objections and motions. Presently defendants' counsel declared that he was not arguing for the admissibility of the answer and was confining himself to opposition to the motion for a mistrial. At that point the presiding judge stated that he would postpone his ruling upon the motion and thereupon had the jury return to the courtroom. He then instructed the jury to disregard wholly the question. The trial then resumed and defendant's counsel abandoned the challenged question. Later the presiding judge denied the motion for a mistrial and in so doing expressed a belief that the question was asked in good faith. Since the question upon which the motion for a mistrial was based was withdrawn, we need not determine whether the answer which it sought was

admissible and are required to go no further than to determine whether the mere asking of the question prejudiced the state. Unfortunately, the challenged question was placed in leading form, yet that fact was not mentioned in the state's objections.

The state's brief, we observe, cites no authority in support of its proposition that the question was objectionable. Its objection mentioned no rule of evidence.

Since this appeal does not require us to determine the admissibility of the fact sought by the challenged question, we do not do so, but it is clear that the trial judge was well warranted in ruling that defendants' counsel was not guilty of bad faith.

We do not believe that whether the sale of the property by Mrs. Shaw to the defendants was prompted by need for funds or was made by her as a seller who had no pressing need for money was a decisive factor in the case. It will be recalled that Mrs. Shaw sold the property to the defendants for $15,000 cash. One year and eight months later, that is, on May 6, 1960, the property was worth, according to the state's two expert appraisers (Mr. Rodman and Mr. Boehmer), $17,000. Thus, the property had enhanced in value $2,000 in a period of one year and eight months. It had advanced that much in value notwithstanding the fact that the state's brief declares (as indicated in the foregoing excerpts) "there was no evidence that its condition had changed from the time of the sale to the date of valuation * * * there was no evidence of a change in market conditions in the interim." No one sought to account for the difference between the sum of $17,000 and the amount that Mrs. Shaw was paid. The defendants produced three expert appraisers who gave respectively the following sums as the value of the property on May 6,

1960: $16,700, $18,000 and $18,250. Thus, it is seen that the experts did not disagree in an important amount. It seems reasonable to conclude that the state's disappointment with the verdict did not have its seat in the value of the property at the time of the taking, but in the damage inflicted upon the remainder of the property after the ten acre tract had been taken. The determination of the amount of the damage was not affected in any way with the challenged question as to whether or not Mrs. Shaw's sale was prompted by a need for money.

■ The state's motion for a mistrial was addressed to the discretionary power of the trial judge. The rule is thus stated in *Guedon v. Rooney,* 160 Or 621, 87 P2d 209, 120 ALR 1298:

> "We are not unmindful of the rule that wide discretion is vested in the trial court in deciding whether a mistrial shall be declared. That discretion, however, is not absolute. No general rule, it is true, can be laid down as to what specific set of circumstances will result in a mistrial. * * *"

See also *Frint v. Amato,* 131 Or 631, 284 P 183.

The rule employed in this state is in harmony with the general rule which, as stated in 53 Am Jur, Trial, § 967, page 679, reads as follows:

> "As a general rule, in civil cases a juror may be withdrawn and the trial declared a mistrial when necessary to prevent the defeat of justice or in the furtherance of justice, as in cases of surprise. * * * Upon all such applications the trial court has a wide discretion as to whether to discharge the jury and declare a new trial * * * The court's discretion is not absolute, however, and the circumstances may be such that the refusal to declare a mistrial will constitute reversible error."

■ We are aware of no reason for believing that

the trial judge abused his discretion in overruling the state's motion for a mistrial. This assignment of error lacks merit.

We now proceed to the three remaining assignments of error, that is, the second, third and fourth. All of them are based upon rulings which were made during the empanelling of the jury.

■ The fourth assignment of error—being the first of the three remaining assignments of error to which we will give attention—contends that the trial judge erred when he sustained the defendant's objection to the following question which the state submitted to a venireman by the name of John Z. Crockett: "What is your opinion of the fairness of the State Highway Department's right-of-way policies?" The defendants' objection suggested, "He can ask if he has an opinion, and if it would affect this case, but I don't think he can ask what that opinion is." Mr. Crockett, in answer to one of the state's questions, had replied that he had an opinion concerning the state's right-of-way buying policy and he had also stated that his opinion would give neither party to this case an advantage. He answered "Yes" to the following question which the trial judge submitted to him: "Whatever opinion you may have, are you willing to set that opinion aside completely for the purpose of the trial of this case, and decide the case strictly on the evidence you hear from the witness stand?" The state's right-of-way buying policies, whatever they may have been, were not an issue in this case. The record does not indicate that Mr. Crockett was acquainted with the policies. We have read the entire transcript of the trial proceedings which includes all questions submitted to the veniremen and all arguments made to the trial judge and the jury, but have found no indication that the

state's right-of-way buying policy was an issue. Obviously, the amount of the verdict was governed by our laws pertaining to condemnation actions. The prospective jurors' impressions concerning the state's administration practices were irrelevant, and the trial judge properly treated them as such. No error is revealed by this assignment of error.

We will now consider the second and third assignments of error as one. Each attacks a ruling by the trial judge which denied a state's challenge for cause of a juror.

By returning to a preceding paragraph of this opinion where we quoted the four assignments of error it will be noticed that the second of them contends that the trial judge erroneously denied the state's challenge for cause of a venire woman by the name of Mrs. Rita Ganong. The challenge as to her was expressed to the judge by the state's counsel in these words:

"She testified that she has at times possibly or even probably had an opinion of the right-of-way buying policies of the State Highway Department, she further indicated that she has heard discussion by others which were against, which showed the State Highway Department buying policies were not good. We feel that this is a close matter and is one in which perhaps Mrs. Ganong should not sit in this case, and we would ask that she be excused for cause."

■ Mrs. Ganong had lived in Gold Beach for 18 years. She and her husband owned property in that municipality. To the question as to whether or not she had "any opinion of the right-of-way buying policies of the State Highway Department" she answered, "I shouldn't say I don't have an opinion, I have heard it discussed a good many times and maybe at one time or another I have had an opinion one way or the other,

but I would certainly try to be fair." We pause to point out that the matter at issue was not the state's right-of-way buying policies, but the amount that the jury, under the instructions of the court, should award to the defendant for the land taken. ORS 17.135 states:

"Particular causes of challenge are of two kinds:

\* \* \*

"(2) Actual bias, which is the existence of a state of mind on the part of the juror, in reference to the action, or to either party, which satisfies the court, in the exercise of a sound discretion, that he can not try the issue impartially and without prejudice to the substantial rights of the party challenging."

ORS 17.145 declares:

"A challenge for actual bias may be taken for the cause mentioned in subsection (2) of ORS 17.135; but on the trial of such challenge, although it should appear that the juror challenged has formed or expressed an opinion upon the merits of the cause from what he may have heard or read, such opinion shall not of itself be sufficient to sustain the challenge, but the court must be satisfied, from all the circumstances, that the juror cannot disregard such opinion and try the issue impartially."

■ The third assignment of error complains because the trial judge overruled a challenge for cause to a venireman by the name of Isenhart. The challenge follows:

"Your Honor probably recalls his testimony concerning his own case which ultimately went to a settlement and the Henry case, he has indicated that he doesn't consider the State to have been fair in either of those cases on the amount that was offered.

"We feel that this would, in a close case, affect

his judgment in this case. We concede the right for him to have an opinion, but we don't think a man could make a fair and impartial juror of this kind, and we ask that he be excused."

In response to questions submitted to him by counsel for the state Mr. Isenhart had stated that his own case concerned "just an easement." In response to a further question he answered that he thought "they didn't offer quite enough, but we settled out of court" and added, "It was a small item anyway and just as an easement would be." Pertaining to the Henry case he replied that he thought that the state's opening offer was not fair. While he was giving those answers the presiding judge asked him, "Would you have any trouble acting as a fair and impartial juror?" Mr. Isenhart answered, "No, I wouldn't." Shortly, he added, "I realize the state has to condemn property." Before the trial judge made his final ruling he asked Mr. Isenhart, "Will you be able to set aside any prior opinion you may have, Mr. Isenhart, and try this case completely on its own merits, listening to the evidence from the witness stand and, of course, use your own common sense, but above all, set aside any opinion you may have? Are you able to do that?" and received the answer, "Certainly, Your Honor."

We have quoted the statutes that govern the two assignments of error now under review. We believe they clearly indicate that the state's contentions are without merit. In ruling upon a motion for a new trial the presiding judge stated in a written opinion, "I find absolutely no merit in your contention regarding the three jurors which you excused." We are aware of no reason for believing that the trial judge's ruling which denied the challenges for cause were erroneous.

The judgment of the circuit court is affirmed.