Argued April 18, affirmed June 17, reconsideration denied July 24,
petition for review denied September 4, 1974

STATE HIGHWAY COMMISSION, *Appellant, v.*
EMPIRE BUILDING MATERIAL CO. ET AL,
*Respondents,* BESSER COMPANY ET AL,
*Defendants.*

523 P2d 584

*John W. Burgess,* Assistant Attorney General, Salem, argued the cause for appellant. With him on the briefs were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

*John L. Schwabe,* Portland, argued the cause for respondents. With him on the brief were George W. Mead, Jr., and Alan H. Johansen, Portland.

Before SCHWAB, Chief Judge, and FOLEY and THORNTON, Judges.

THORNTON, J.

The State Highway Commission (Commission) brought this condemnation action to acquire 19.8 acres of land owned by defendant Empire Building Material Co. (Empire). The property was required for use in construction of the Columbia River-Pacific Highway section of the East Portland freeway in Multnomah County.

The 19.8 acres sought by eminent domain were part of an approximate 26-acre tract owned by Empire, upon which Empire operated a concrete products plant. The plant was situated primarily upon an eight-acre tract, where it had been established in 1945, and where it continued to operate. In June 1968 Empire purchased the adjoining 17.96 acres, which provided room for expansion, although Empire had not significantly done so at the time of condemnation (December 1971).

The 19.8 acres being taken included virtually all of the 17.96 acres purchased in 1968, plus two acres of the original eight-acre tract, leaving Empire with roughly six acres upon which to operate its plant. The taking also included several buildings and various items of machinery and equipment.

The Commission's complaint alleged the sum of $435,000 as just compensation for the taking. However, the Commission had previously made offers of $722,200 (June 15, 1971) and $512,000 (July 12, 1971), which offers were refused by Empire. Empire answered that $2,067,400 was just compensation for the taking. The jury awarded Empire $863,250 and the Commission appeals.

The Commission argues that the case should be reversed and remanded for a new trial because of the following actions taken by the trial judge, which the Commission alleges were erroneous:

(1) The trial judge excluded testimony concerning the June 1968 purchase price Empire paid for the adjoining 17.96 acres, which was offered as a "comparable sale" (among seven others) upon which the Commission's appraisers based their opinions as to

the value of the 19.8 acres being taken in December 1971.

(2) The trial judge ruled, as a matter of law, that certain items of machinery and equipment were fixtures, included within or damaged by the taking.

(3) The trial judge refused an offer of proof which allegedly would indicate that Empire bought the adjoining 17.96 acres in 1968 for speculatory reasons, rather than for expansion of its plant.

## I. 1968 Purchase Price

Mr. Haley, one of the state's appraisers, testified as to his opinion of the value of the land and property being taken by the state (as of December 1971). Concerning the value of the land, he testified that he used the "market data" approach and explained that he checked 25 or 30 recent, similar industrial sales in the general area. Six or seven of these sales were particularly helpful to Mr. Haley in forming his opinion as to the present value of the property being taken. As the first of these comparable sales, Mr. Haley began to describe the 1968 purchase by Empire.

Empire objected to any evidence of the price it paid for the 17.96 acres in 1968 on the ground that it was not a comparable sale. Empire argued that the property had changed physically and in market value over the three and one-half years since the 1968 purchase and was therefore not the same property in 1971. The trial judge at first stated that such evidence is not admissible; however he heard arguments on the matter and the Commission's offer of proof that Empire paid $120,500 for the 17.96 acres in 1968 (about $6,700 per acre). The trial judge stated that under *Douglas County v. Meyers et al.*, 201 Or 59, 268

P2d 625 (1954), admission of this sale price was a matter within the court's discretion. The judge then rejected the Commission's offer, ruling that the 1968 purchase price was not admissible because not a comparable sale.

Thereafter, Mr. Haley testified concerning six other sales that he deemed comparable. The value of these sales ranged from $6,990 per acre (1968) to $15,000 per acre (1970). Mr. Haley testified that in his opinion the 19.8 acres which the state sought by eminent domain were worth $217,450 in December 1971 (about $11,000 per acre).

The Commission's other appraiser, Mr. Buettner, testified that he based his opinion on the above sales, plus a 1968 sale of 16.05 acres at $12,070 per acre, which Mr. Haley did not mention. Mr. Buettner concluded that the 19.8 acres of land were worth $232,500 (17.5 acres at $10,000 per acre and 2.3 acres at $25,000 per acre). Thus the Commission's appraisers introduced evidence of seven comparable sales, other than the 1968 purchase by Empire.

■ The general rule is that evidence of the price an owner paid for property is relevant and admissible evidence concerning the value of property in a condemnation proceeding. *See,* Annotation, 55 ALR2d 791 (1957); 5 Nichols on Eminent Domain 21-4, § 21.2 (3d ed 1969). However, the rule in Oregon is that "it is within the sound discretion of the trial court to admit or exclude testimony as to the purchase price of property paid by the owner" of property taken in a condemnation proceeding. *Highway Commission v. Jones,* 237 Or 372, 374, 391 P2d 625 (1964); *see,* 5 Nichols, supra at 21-13.

The purchase price paid by an owner has been excluded when it was "too remote" in time to be a "proper criterion of present values," *Portland v. Tigard,* 64 Or 404, 408, 129 P 755, 130 P 982 (1913), or when the land in question has increased in value since the purchase in question, *Highway Commission v. Jones,* supra at 375, and *Highway Commission v. Hewitt et al,* 229 Or 582, 590, 368 P2d 346 (1962). On the other hand, our Supreme Court has held that no error was committed by admitting evidence of the purchase price paid by an owner when there has been no timely objection that the purchase price no longer reflects the property's present market value, *Arley v. Chaney/Nelson,* 262 Or 69, 81, 496 P2d 202 (1972), *Moore Mill & Lbr. Co. v. Foster,* 216 Or 204, 255, 336 P2d 39, 337 P2d 810 (1959), and *Fidelity Sec. Corp. v. Brugman et al.,* 137 Or 38, 48, 1 P2d 131 (1931), or when the sale was not too remote or there was no evidence that conditions affecting value have materially changed, *Douglas County v. Meyers et al.,* 201 Or 59, 65, 268 P2d 625 (1954). As our court said in *Fidelity:*

> "* * * When the sale of property is so recent in time that conditions then affecting value are substantially the same as those present at the time of the challenged transaction, the price obtained for the property in the sale may be disclosed for the purpose of establishing the property's present value * * *. But when the sale was made at a remote time or when conditions affecting value have materially changed, evidence of the sale price is inadmissible * * *." 137 Or at 48.

■ The evidence in the case at bar indicates that conditions affecting value have changed materially. Some fill has been added to the land, the land has an additional street access by virtue of being annexed to

Empire's original property, and the land is necessary for further expansion, if any, of Empire's production capacity. Further, all the appraisers testified that the land was worth more at the time of the taking (December 1971) than when purchased in June 1968. Also of importance is the fact that the taking includes two acres of Empire's original, developed property, along with several buildings and various items of machinery and equipment. All these factors provided a basis for the trial court's exclusion of the 1968 purchase price. This was a matter well within the court's discretion. *Highway Commission v. Jones,* supra.

■ The Commission argues that the trial judge actually did not exercise his discretion at all, excluding the evidence as a matter of law. The record does not support this argument. Even assuming, *arguendo,* that the Commission is correct and that the evidence should have been admitted, it does not appear that the Commission was prejudiced by the court's ruling. The Commission's appraisers testified fully as to seven other comparable sales and fully explained the basis of their opinions concerning the value of the property being taken in December 1971. The burden is on the appellant to demonstrate not only error but prejudicial error before a reversal and new trial will be justified. *Fassett v. Santiam Loggers, Inc.,* 267 Or 505, 517 P2d 1059 (1973); *State Highway Comm. v. Carmel Est.,* 15 Or App 41, 514 P2d 1124 (1973). The Commission has not demonstrated that it has been prejudiced by the ruling in question. *See, State Highway Commission v. Lee,* 207 Kan 284, 485 P2d 310 (1971); *but see, State, by Mondale v. Larson,* 285 Minn 467, 174 NW2d 114 (1970).

## II. Fixtures

Attached to Empire's answer to the Commission's complaint in eminent domain were two separate lists of machinery and equipment which Empire considered to be fixtures. One list included those items located on that portion of the property being taken; the other listed items alleged to be damaged by the taking, although not located on the property being taken. Empire argued that these items were attached (annexed) to the property, and adapted for the particular use for which it was best suited (Empire's concrete products plant), in such a manner as to reveal an intention that they were to remain permanent fixtures (part of the realty, as opposed to removable items of personal property).

The Commission, on the other hand, argued that most of these items were not fixtures because they were removable. The Commission then offered evidence that many of the items of machinery and equipment could physically be removed from the property and resold as used machinery. Empire objected to evidence of removability and resalability on the ground that the particular items were fixtures and were not to be removed by Empire.

After the parties were unable to reach an agreement on the fixtures, the trial judge ruled that he would examine the lists of machinery and equipment and decide which items were fixtures as a matter of law. The judge stated that he preferred to rule on the items first, so as not to confuse the jury with a mass of irrelevant evidence. The judge then ruled that evidence of a resale market for a particular item of equipment was not relevant to whether that item had become a fixture or had remained an item of personal prop-

erty. The Commission's trial attorney, however, said that in his opinion that issue was "* * * a question of mixed law and fact."

Thereafter, with the jury absent, the court and counsel went down the list of equipment. The Highway Commission's appraiser testified concerning each item and photos of each were admitted into evidence (the trial judge and the jury had previously viewed the property and the machinery and equipment located thereon). Item by item the judge ruled whether, as a matter of law, that particular item was a fixture, regardless of that item's possible removability or resalability. Many of the items listed were not contested.[1]

The Commission argues that this procedure was erroneous and that each item in question should have been submitted to the jury for its determination as to whether a fixture or not.

■ The law of fixtures in the United States has generally evolved from the landmark case of *Teaff v. Hewitt,* 1 Ohio St 511, 59 Am Dec 634 (1853), which set forth a threefold test of a fixture. *See,* Brown on Personal Property 698, 700, § 137 (2d ed 1936) ; Note, 19 Or L Rev 152 (1940). In adopting *Teaff,* our Supreme Court has said that the status of an article of personalty as a fixture depends upon (1) annexation, real or constructive, to the real property; (2) adaptation to the use or purpose of the realty, where, and as attached; and (3) the intention of the annexor to make

---

[1] In its brief Empire argues that the Highway Commission did not object to this procedure, or at least that the Commission acquiesced in the procedure. Our examination of the record reveals that the Commission did express an objection, albeit minimally.

the item a permanent accession to the freehold. *Helm et al. v. Gilroy et al.*, 20 Or 517, 522, 26 P 851 (1891); *Alberson v. Mining Co.*, 39 Or 552, 558-59, 65 P 978 (1901). Of the three tests—annexation, adaptation and intention—the most important element, which is said to generally be controlling, "at least where there is doubt as to the effect of the other two tests," is the objective intention of the annexor. *Highway Com. v. Feves et al*, 228 Or 273, 278, 365 P2d 97 (1961).

■ The intention of the annexor can be inferred from "the nature of the article, the relation of the party annexing, the policy of the law in relation thereto, the structure and mode of annexation, and the purpose and use" for which the annexation of the article was made. *Johnson v. Pacific Land Co.*, 84 Or 356, 361, 164 P 564 (1917). Thus the law deduces the controlling intention from all of the circumstances of the annexation. 84 Or at 362.

■ In this light, the question of whether an item is a fixture is in essence a mixed question of law and fact. *Alberson v. Mining Co.*, supra at 559; *Johnson v. Pacific Land Co.*, supra at 363. However, under certain circumstances, an article may be determined to be a fixture as a matter of law. *Masheter v. Boehm*, 37 Ohio St2d 68, 307 NE2d 533 (1974); *Bay State York Co. v. Marvix, Inc.*, 331 Mass 407, 119 NE2d 727, 729 (1954). This occurs when "the evidence may be so clear that only one conclusion can be drawn therefrom, and in such cases the court will take the matter from the jury and itself decide the case, it being said, perhaps metaphorically, that the question is one of law." Brown, supra at 703. *See, e.g., Beebe v. Pioneer Bank & Trust Co.*, 34 Idaho 385, 201 P 717 (1921), where the court held that a vault door in a bank building was a fixture as a matter of law.

"Where, in an appropriation proceeding, there is no substantial dispute of material fact concerning the identity, nature and function of property for which 'fixture' status is sought, determination of the extent of the taking [whether an item is an included fixture] is a question of law to be decided by the court * * *." *Masheter v. Boehm,* supra, 307 NE2d at 540; *cf., Kraxberger v. Rogers,* 231 Or 440, 451, 373 P2d 647 (1962) (negligence action—family purpose doctrine); *Unemp. Compensation Com. v. Brown,* 225 Or 306, 309, 358 P2d 502 (1960) (unemployment insurance).

The only apparent question presented concerning the fixtures is: What effect does removability and resalability have in determining whether Empire's machinery and equipment are fixtures or personal property? The Commission did not present evidence, nor did it argue, that the machinery and equipment were not attached to the realty—they are either bolted to special cement foundations, or bolted and welded to the structure of buildings. Nor did the Commission argue that the machinery was not adapted for use in the production of concrete products. Of primary importance, there was no evidence that Empire, as the annexor, intended its annexation of the machinery and equipment to be anything other than permanent, that is, until the machinery wore out. It is also self-evident that removal of the articles would render the property useless for its intended purpose—production of concrete products.

It appears that the three tests of a fixture have been met. *Helm et al. v. Gilroy et al.,* supra; *Alberson v. Mining Co.,* supra. The Commission's argument is, however, that the machinery could possibly be removed and resold; hence the items were not fixtures. The fact that it is possible to remove this

machinery by dismantling it was not contested; therefore, on the evidence presented, there was no factual question for the jury to decide. There was only a legal question as to the effect of removability on the question of fixtures. On this basis the trial judge ruled that the items were fixtures because they were attached, adapted for use in concrete products production, and affixed with the intention to remain permanently in place, regardless of possible removability or resalability.

In some instances ease of removability is significant. Hence in *Dunn v. Assets Realization Co.,* 141 Or 298, 16 P2d 370, 17 P2d 1118 (1933), *Elliott et ux v. Tallmadge,* 207 Or 428, 297 P2d 310 (1956), and *Highway Com. v. Feves et al,* supra, it was held that certain kitchen appliances (electric ranges and refrigerators), which were merely plugged into electric sockets and easily unhooked from exhaust vents, were not fixtures. On the other hand, items not so easily removed, although removable, were determined to be fixtures in *Helm et al. v. Gilroy et al.,* supra (factory machinery), *Johnson v. Pacific Land Co.,* supra (pump, motor, tank—all part of house water system), *Blake-McFall Co. v. Wilson,* 98 Or 626, 193 P 902 (1921) (freight elevator in building), *First State etc. Bank v. Oliver et al.,* 101 Or 42, 198 P 920 (1921) (farm irrigation system, including pumps, motor and pipe), *Metropolitan Life Ins. Co v. Kimball,* 163 Or 31, 94 P2d 1101 (1939) (equipment and machinery in prune drying plant), *Highway Comm. v. Superbilt Mfg. Co.,* 204 Or 393, 281 P2d 707 (1955) (machinery in furniture factory—by implication), *Highway Com. v. Feves et al,* supra (pull-down "Murphy" beds attached by bolts to walls of apartment house), *Dean Vincent, Inc. et al v. Redisco, Inc.,* 232 Or 170, 373 P2d 995 (1962) (wall-

to-wall carpeting), and *Martin v. McCaige,* 261 Or 99, 109, 492 P2d 770 (1972) (irrigation system, including pumps, motor, pipe, etc.). Thus, "in many cases little weight is given to this factor" of removability of the fixture. *Highway Com. v. Feves et al,* supra, 228 Or at 281.

In an analogous situation (though not an eminent domain proceeding) the Washington Supreme Court held that mining equipment was a fixture, even though it could be removed by unbolting it from its cement foundations and could easily be resold. The equipment "was attached to the real estate as firmly as it appears to have been reasonably possible," was in use in operation of the mine, and, of prime importance, "was so attached by the owner himself." Therefore, the court concluded that the equipment was intended to constitute part of the realty. *Strong v. Sunset Copper Co.,* 9 Wash2d 214, 229-30, 114 P2d 526 (1941).

In *Helm et al. v. Gilroy et al.,* supra, the court found that certain machinery in a sash and door factory and planing mill were fixtures. The court said:

"* * * Its annexation to the realty was sufficiently permanent to enable it to be used for the purposes intended, and was of the character usual with such machinery. It is true the screws and bolts with which it was annexed could have been taken out and the machinery removed without serious damage to it or the building, but so no doubt could have been the doors and windows. It was in its very nature adapted to the business for which the land was used. The party making the annexation must have intended that it should remain as long as it continued serviceable, as the convenience

and usefulness of the property would have been seriously impaired by its removal." 20 Or at 522-23.

Similarly, in *Johnson v. Pacific Land Co.*, supra, the court held that a pump, motor and water tank (part of the water system of a home) were fixtures.

"* * * Articles which enhance the comfort of a home such as water-pipes, water-tanks, cisterns, etc., are as a rule considered fixtures when attached in the usual manner * * *." 84 Or at 360.

The court said that it is usually conclusive that an article has become a fixture when it has been so affixed that it cannot be severed without injury to the freehold. 84 Or at 361. The court agreed with the jury's determination that removal of these items of the water system would constitute an injury to the freehold. 84 Or at 363.

■ Thus, injury to the freehold does not necessarily mean physical damage to the structure, but may well mean impairment of the use for which the property in question was intended or adopted. The freehold has been injured if removal of the article renders the property useless, or lessens the property's practical value, for that purpose for which it was customarily used.

Removability has often been raised by a condemning authority as a ground for not compensating the condemnee for fixtures. In the landmark case of *Jackson v. State of New York,* 213 NY 34, 106 NE 758 (1914), Judge Cardozo held that machinery, shafting, elevators and conveyors in a warehouse were fixtures for which the state, as the condemnor, must pay. Judge Cardozo said:

"* * * Condemnation is an enforced sale, and the State stands toward the owner as buyer toward

seller. * * * It is intolerable that the State, after condemning a factory or warehouse, should surrender to the owner a stock of second-hand machinery and in so doing discharge the full measure of its duty. Severed from the building, such machinery commands only the prices of second-hand articles; attached to a going plant, it may produce an enhancement of value as great as it did when new. The law gives no sanction to so obvious an injustice as would result if the owner were held to forfeit all these elements of value * * *." 213 NY at 35-36.

The New York courts have adopted a realistic approach to the problem of fixtures in eminent domain proceedings. In *Rose v. State of New York*, 24 NY2d 80, 246 NE2d 735 (1969), the state diverted a riverbed which had the effect of substantially destroying plaintiff's sand, gravel and cement operation. The state appealed from an award of damages for the loss of machinery found to be fixtures (many of which were removable). The court said:

"New York takes a broad view in evaluating what improvements are to be regarded as fixtures. Not only is machinery deemed a fixture 'where it is installed in such manner that its removal will result in material injury to it or the realty, or where the building in which it is placed was specially designed to house it, or where there is other evidence that its installation was of a permanent nature' [citing cases], but also those improvements which are used for business purposes and which would lose substantial value if removed [citing cases].

"This formulation of the rules permits equitable treatment of the owner of fixtures. It signifies a recognition of the obvious realities confronting the business community. Modern business, in order to produce goods and services, invests heavily in cumbersome and complicated machinery which, because

of the manner of its installation, can only be removed with difficulty. This approach to the problem of fixtures, however, recognizes that on occasion these structures can be profitably removed to another location and used by the owner * * *. On these occasions, however, * * * it would be inequitable to treat these items as personalty simply because of the possibility of removal at less than total destruction of the machine or the structure which houses it." 24 NY2d at 86.

Following *Rose,* several New York courts have said that removability is not a test of a fixture, at least in the context of an eminent domain proceeding concerning industrial or commercial equipment and machinery. Removability only becomes relevant in valuing the fixtures. *Rose v. State of New York,* supra at 88. "* * * [A]nnexation, adaptability, and intention of permanence convert machinery into a fixture regardless of removability * * *," which is readily presumed in the case of an owner who installs machinery suited for the purpose and with the object of carrying on his business. *In re Ruppert Brewery Urban Renewal Project,* 67 Misc2d 863, 325 NYS2d 438, 447 (1971). Removal of a fixture is an option of the owner, not of the condemning authority. *City of New York v. Atlantic Term. Renewal,* 72 Misc2d 171, 338 NYS2d 504, 515 (1972).

In *Wilmington Housing Authority v. Parcel of Land,* 59 Del 278, 219 A2d 148 (1966), the condemnor argued that certain machinery, attached to a building by bolts, water lines, electric cables and other similar means, could be removed without damage to the machines or to the building and were therefore not fixtures. The court rejected that argument stating:

"* * * Removability alone, while significant, is not controlling, as to what the intention of the

annexor was. The true test, we think, is whether or not the chattel was affixed to the realty for a temporary or a permanent purpose. [Citing cases.]

"* * * * *

"* * * We think that a person installing and intending to operate massive machinery of this kind in an adequate location probably intended at the time of installation that the installation would be permanent. This conclusion is simple common sense." 59 Del at 282-83.

In *City of Los Angeles v. Klinker,* 219 Cal 198, 25 P2d 826, 90 ALR 148 (1933), cited in *Highway Com. v. Feves et al,* supra, 228 Or at 280-81, the city condemned the processing plant of the Los Angeles Times. The city argued that the machinery and equipment in the plant were not fixtures because they could be removed; however, the court rejected that argument.

"It is, of course, true that the manner in which the fixtures are annexed, the purpose for which the premises are used and the intention of the persons who made the annexation are all to receive weight in settling this issue. It is also true that the intention of the parties, where mutual rights are involved, is of controlling importance, such as in the case of a lessor and lessee, or vendor and vendee under a conditional sales contract. But *where,* as here, *the owner's own conduct alone is to be reviewed, the nature and adaptability of the machinery and the manner of its installation would practically control the question of intent as against a vendor or a condemnor.* Here we have not only the manner of annexation of the fixtures and the purpose for which the premises were used, but we have the acts and conduct of the owner in installing these fixtures and, when viewed as a whole, we are unable to escape the conclusion that so much of the fixtures as are denoted in the record by the term 'processing equipment' are, actually or con-

structively, an improvement of the real property [fixtures]." 219 Cal at 209-10. (Emphasis supplied.)[2]

■ It is undisputed that the machinery and equipment in the case at bar were attached and adapted for use in the production of concrete products. It is also readily apparent from the exhibits and testimony that these items were intended to be installed permanently. Therefore, the possibility of removal is not controlling as to whether a particular item in question is a fixture. Because there was no dispute as to the essential facts concerning the attachment, adaptation and intention of the annexor in this case, the question was properly a question of law for the trial court.

### III.

■ The Commission's final assignment of error is that the trial court should have admitted the Commission's offer of proof concerning Empire's reasons for purchasing the adjoining 17.96 acres in June 1968. The Commission's argument is that Empire can economically operate on the six acres left after the taking because it was able to operate on eight acres from 1945 to 1968. The Commission argues that Empire purchased the adjoining acreage in June 1968, not for expansion of its plant, but for reasons of speculation —to attract a possible buyer for the entire business. Therefore, it argues that Empire was not substantially damaged by the taking.

---

[2] This result is now reached in California by statute:

"Equipment designed for manufacturing or industrial purposes and installed for use in a fixed location shall be deemed to be a part of the realty for the purposes of condemnation, regardless of the method of installation." Cal Civ Proc Code, § 1248b (West 1972).

As an offer of proof, the Commission cross-examined Empire's owner, Mr. Spangler. Mr. Spangler testified that Empire acquired the adjoining 17.96 acres in June of 1968, and that in September of 1968 he began negotiations with Allied Equities, Inc., for the possible sale of Empire. However, in June of 1968 Mr. Spangler had never heard of Allied, but was aware that Empire was not marketable as a going business without expansion capabilities. After hearing this, the trial court ruled that the evidence was not admissible because "whether Allied owned it, whether Spangler owned it or whether Empire owned it [it] is still a taking regardless," and was not relevant to the question of whether Empire could economically operate on the remaining six acres. The Commission conceded that this was its only evidence in support of this theory.

For several reasons we find this last assignment of error to be without merit:

(a) The offer does not support the Commission's theory. Mr. Spangler's testimony is quite clear that no prospective purchasers were involved in the decision to purchase the adjoining acreage.

(b) The evidence is not relevant because damages are determined as of the time of the taking, December 1971, not the date of Empire's purchase of the 17.96 acres, June 1968. *See, Highway Comm. v. Superbilt Mfg. Co.*, 204 Or 393, 412, 281 P2d 707 (1955); *Keane et al. v. City of Portland et al.*, 115 Or 1, 12, 235 P2d 677 (1925). Both sides introduced considerable evidence upon the question of Empire's ability to continue to operate economically on the remaining six acres.

(c) Even assuming, *arguendo,* that exclusion of

this offer of proof was error, it was not reversible error. *See, State Highway Comm. v. Carmel Est.,* 15 Or App 41, 514 P2d 1124 (1973) ; *Alaska State Housing Authority v. DuPont,* 439 P2d 427 (Alaska 1968) (admission of incompetent evidence) ; 5 Nichols on Eminent Domain 17-28, 17-29, § 17.1 [4] (3d ed 1969), Supp 22 (1974).

"* * * [I]t is undoubtedly the fact that in passing upon the admissibility of evidence of value more is left to the discretion of the trial court than in the determination of most other issues. It follows that an exception to the admission or exclusion of evidence in a land damage case will ordinarily not be sustained except in case of manifest error. Moreover, the modern tendency to restrict the setting aside of verdicts for errors which do not cause substantial injustice is especially noticeable in land damage cases. Such cases usually involve a protracted and expensive trial, and, as a rule, are determined by the consideration of a mass of separate items of evidence. The admission or exclusion of one bit of testimony of questionable materiality is not likely to be of vital importance and some courts are very reluctant to set aside a verdict in cases of this character for even a manifest error in regard to evidence, when no wrong theory of determining damages was adopted by the trial court, especially when the jury has taken a view of the premises." (Footnotes omitted.) 5 Nichols, *supra* at 18-22, § 18.1 [3].

Affirmed.