Sidney A. Fine, J.
This is a proceeding in eminent domain brought by the City of New York to acquire title in fee simple absolute to certain real property within the area bounded generally by East 90th Street, 3rd Avenue, East 94th Street and 2nd Avenue, in the Borough of Manhattan, City and State of New York, including title to street areas (where title in fee for such purposes has not heretofore been acquired for such purposes) required for a project known as Ruppert Brewery Urban Renewal Project.
Title vested in the City of New York on September 3, 1968. The court has made the required statutory view of the subject properties.
The site of the proceeding is in that section of Manhattan known as Yorkville, a largely residential and small retail business area redolent with the ethnic and cultural flavor of Old European tradition, particularly in the area east of Third Avenue. In recent years, spurred by the removal of the Second and Third Avenue elevated subway lines, the unprecedented demand for middle class and luxury housing in the city, the tremendous amount of office building construction in mid and lower Manhattan and the deterioration of the West side of the Borough, there has resulted a remarkable burgeoning of the East side of Manhattan as probably the most desirable and expensive residential area in the City of New York. Inevitably, the consequence in recent years has been a frantic competition for the assemblage of land on the upper East side of Manhattan for the construction of high-rise luxury condominiums and co-operatives and the conversion of many of the tenements in the area into modern apartment houses at high rentals. The resultant increase in land value has been explosive and phenomenal.
However, it must be clearly noted that all of this redevelopment, demand and upward trend is sharply restricted to the area south of 96th Street. North of this dividing line lies a noisome ghetto shadowed by the overhead tracks of the railroad line that emerges at 96th Street and Park Avenue to *866 transport its daily load of commuters to the northern suburbs.
The overriding appraisal problem presented in this proceeding is the approach to be taken in the valuation of the land. Despite the largely residential character of the surrounding area, the subject properties, principally because of their proximity to a now destroyed landmark, the old Ruppert Brewery, remain mostly an enclave of garage-type and loft buildings used for manufacturing, auto storage and • servicing and other commercial purposes. With the exception of several tenements and a supermarket on Third Avenue between 93rd and 94th Streets that are zoned C2-8, all of the remaining parcels are zoned M3-2. The latter zoning' classification permits largely unrestricted manufacturing use and the subject site is one of the few remaining M3-2 zones on the upper East side of Manhattan. The experts agree that this zoning was a “ carryover ” from the city’s old zoning plan and that it encompassed certain core areas to protect old uses and jobs for local people. Thus, the land under review may be viewed as being enhanced in value, particularly for garage purposes, by reason of the demand created by surrounding residential development. Value appreciation would likewise accrue in the event of the well-nigh, inevitable likelihood of zoning change or the granting of variances to meet the pressures of the demand and need for residential development. The Ruppert Brewery, part of this urban redevelopment site, actually had been purchased prior to condemnation by private interests for high-rise luxury development and these very parcels are being acquired here for housing purposes.
This has been the view generally adopted by the experts for the claimants as reflected by the sales and leases submitted by them as a basis for their land units that range from $14 to $18.50 per square foot for the side streets, $20 for Second Avenue and $30 for Third Avenue. Concededly, values increase appreciably in a westerly direction to Fifth Avenue. The city’s expert, keeping his gaze carefully averted from the future and looking backward in time and to the east in direction, arrived at unit valuations mainly in reliance on sales going back to 1964 and 1965 that were either on First Avenue or east of First Avenue; on sales to the New York City Housing Authority in lieu of condemnation that can hardly be considered as open market transactions with a willing seller; and on leases either north of 96th Street or made in 1963 on property east of First Avenue. These units per square foot are $9 for the side streets, $12.80 for Second Avenue and $13.20 for Third Avenue.
*867 The court cannot give a great deal of consideration to the city’s land units. They are based on sales and leases that bear little relationship to the pressures and realities of the market in this rapidly changing area.
On the other hand, a great many of the sales and leases relied on by the claimants relate to properties much removed from this area or in more valuable locations or that have been analyzed by methods that produce overinflated comparisons and valuations.
Nevertheless, the extensive record in this case has presented sufficient evidence for the court to carefully balance these opposing extremes and to enable it to fix the following square foot unit values: $12 for side streets; $16 for Second Avenue; and $22 for Third Avenue.
DAMAGE PARCEL 14
On date of title vesting, this damage parcel, located on the southwest corner of Second Avenue and 92nd Street, was improved with a two-story building with basement and partial sub-basement operated by claimant owner as an ice cream manufacturing plant. It is not disputed that this was the highest and best use of the property.
Both claimant and city are agreed the parcel is only susceptible of valuation as an integrated plant in a specialty structure. As a consequence, the experts for both sides have solely relied on the cost approach or summation method of valuation in which the value of the land is added to the reproduction cost less depreciation of the building and the fixtures in the plant. Undeniably this approach represents the optimum in value but there is no other evidence in this record to support an over-all valuation by either the market or income approaches (United States v. Benning Housing Corp., 276 F. 2d 248; Matter of City of New York [A. & W. Realty Corp.], 1 N Y 2d 428).
LAND
The parcel consists of 14,250 square feet of land with 100 feet of frontage on Second Avenue and 142.6 feet on the southerly side of 92nd Street. The city ascribes unit square foot values to Second Avenue of $12.80 and $9 to the side street. The corresponding units of the claimant are $20 and $14. Both sides add the same standard increments for corner and key influence and plottage. However the claimant’s real estate expert also adds a 20% increment for ‘ ‘ conjunctive use ” with Second Avenue frontage of the area of 42.5 feet by 100 feet fronting on 92nd Street at the westerly end of the parcel. *868 This increment claim is disallowed as not supported by any evidence in the record that would indicate any enhancement in side street value by reason of single ownership with avenue frontage, let alone an arbitrary incremental percentage of 20%. Sufficient consideration to such single ownership is implicit in the over-all plottage increment used by both experts to the benefit of the additional side street land. It might be noted that claimant’-s expert considered the additional depth of the parcel beyond 100 feet from Second Avenue as enhanced in value by use with Second Avenue frontage but refrained from utilizing the standard depth rules for excess rearage of a main street parcel.
Consistent with the land units found by the court with respect to the other parcels in the proceeding of $16 on Second Avenue and $12 on 92nd Street and accepting the percentage increments used by both experts, an award for land is made in the sum of $258,500.
BUILDING
The structure was originally erected in 1928 as a garage and was substantially altered in 1945 and in 1952-53 for conversion to an ice cream plant. The alterations were particularly extensive to meet the special needs of the manufacturing process that involved the pasteurization of milk, the manufacture of ice cream and the freezing and storage thereof. Health Department sanitary regulations governing the construction and maintenance of buildings involving milk products and ice cream manufacturing also required the construction of specially tiled rooms, installation of specially adapted sanitary piping for conveyance of milk products throughout the entire manufacturing process and the installation of substantial heating and refrigeration machinery for pasteurization, sterilization, freezing and storage. Additionally the conversion of the structure into a totally synchronized manufacturing plant necessitated the installation of an elevator in place of the original garage ramp between the first and second floors, a drive-in truck loading and unloading area, sanitary facilities for plant personnel and executive offices.
Claimant’s building expert estimated the reproduction cost of the building at $852,560 less 20% for physical or observable depreciation for a resultant sound value of $628,250. The city’s expert estimated a reproduction cost of $959,717 but in collaboration with his fellow machinery expert, adopted a depreciation rate for both building and fixtures of 64% with a resultant sound value for the building of $344,899. This collaborative *869 depreciation rate was arrived at by taking 47% for physical depreciation and 17 % for functional obsolescence.
While it thus appears that the main issue for determination relates to the deduction for functional obsolescence, it must also be observed that it is difficult to understand how two qualified building experts can differ by 135% in a matter as seemingly basic and objective as the visual observation of physical wear and tear. Suffice it to say that such expert testimony would appear to be less than objective and hardly serves as an aid to the court.
Consideration of the criteria to warrant a deduction for functional obsolescence requires no further inquiry than the recently decided case of Barber & Bennett v. State of New York (34 A D 2d 303) in which the contentions of the parties were practically foursquare with those advanced in this case. It was there held (p. 305) that the mere fact that the present building and equipment were ‘ ‘ to some extent obsolete and/or inadequate ’ ’ so that ‘ ‘ a claimant would not faithfully reproduce them upon moving his site of business ’ ’ is not a sufficient basis for a finding of functional obsolescence. Rather the test is a twofold one, one financial and the other technological. As a financial proposition “the question of functional obsolescence is dependent upon the extent to which the existing improvements are adapted to the needs of the business being carried on at the premises and the extent to which the business itself is adapted to profitably serving a public need.” The other test relates to ‘1 technological and inventive advances which lessen the value of older machines and equipment or to merely a new and more efficient way of aligning the processing of raw materials into finished goods thereby lessening the value of limited space buildings and production line equipment.” The city has not established either of the foregoing criteria. There is no substantial dispute and the court finds that the building as converted was well adapted to the business of manufacturing quality ice cream. Further there is no proof in the record that such business was not being operated profitably and to its full capacity. The city’s experts justify this deduction for economic obsolescence on the theory that larger ice cream plants they visited show a 17% greater gallonage production per man hour because of the greater operating efficiency of automatically cleaned sanitary piping and the greater efficiency of having all production facilities on one floor. Neither aspect of this theory was substantiated by any credible proof in the case that went beyond hearsay and conclusion. Firstly, the evidence in *870 the case shows that all of the actual manufacturing process did take place on one floor. Secondly, the city’s expert wholly ignored considering that the cost of installation of an automatic system might be warranted in a larger plant but might well be uneconomic in a smaller plant. Quoting again from Barber & Bennett (p. 307), “ The State has shown that the improvements and fixtures could have produced or resulted in greater profits in a new building, but that does not show that a prospective purchaser would have discounted the value of the subject premises beyond physical depreciation upon the ground of functional or economic obsolescence.” The city has utterly failed to establish either functional or economic obsolescence as a matter of law or as a matter of fact.
With respect to accrued physical depreciation, the city’s building expert took the customary gloomy view of the structure as being of 1928 vintage and poorly maintained. Contrariwise, the claimant’s expert took his customary roseate view and saw a practically new structure in excellent condition. The court takes its own jaundiced view of the opinions of both experts and discounting their advocate roles, finds, on the basis of all of the evidence including the chronological age of the basic structure, the effective age of the improvements and alterations and the remaining economic life of the building, that the structure had suffered a 40% physical deterioration on date of title vesting. Applying this deduction to the court’s finding of a reproduction cost of $900,000 results in a sound value for which a building award is made in the sum of $540,000.
FIXTURES
The major issue in this entire proceeding is created by the city’s theory of valuation of the machinery and equipment in the plant. The condemnee seeks compensation for the sound value in place of all of said items based on an appraised reproduction cost of $945,969 less individual depreciation for each item ranging from 10% to 30% that amounted to am approximate over-all depreciation rate of 20% (the same rate applied to the building) for a sound value of $760,544. This sound value also includes a 6% engineering fee for the design and layout of the machinery in the plant. The city’s machinery expert submitted two appraisals, one for items conceded to be compensable and one for items “if compensable.” The reproduction cost found for the former category is $331,450 less $212,128 arrived at by using the same 64% rate applied to the building for physical depreciation and functional obsolescence, for a *871 sound value of $119,322. In the latter category of “if compensable ’ ’ items, the sound value arrived at is $200,610, based on reproduction cost of $557,249 less 64% depreciation amounting to $356,639. The combined sound value of both categories is $319,932 based on a total reproduction cost of $888,699. These sound values do not include any allowance for engineering fees.
The city’s expert testified that, as instructed by the Corporation Counsel, his category of “ if compensable ” items includes all machinery and fixtures that he found could be removed without material injury to itself or to the structure. Nevertheless, with the exception of two minor items, he found the installation cost of all of such items compensable.
The basic law of fixtures and the criteria to determine their compensability in condemnation proceedings have been firmly established for over a century (McRea v. Central Nat. Bank of Troy, 66 N. Y. 489). No useful purpose would be here served by still another lengthy exposition of the genesis of the oft confirmed proposition that “ annexation, adaptability, and intention of permanence convert machinery into a fixture, regardless of removability” (Matter of City of New York [Lincoln Sq. Slum Clearance Project], 24 Misc 2d 190, 202, mod. on other grounds 15 A D 2d 153, affd. 12 N Y 2d 1086). In the application of this threefold test, the all important criterion of intention of permanence 11 is readily presumed in the case of an owner where (as here), he installs machinery in a building which is especially suited for that purpose, and with the object of carrying on his business therein ” (p. 196). A more recent and additional basis of compensability applies to items that would lose substantial value if removed even though readily removable (Jackson v. State of New York, 213 N. Y. 34; Matter of City of New York [North Riv. Water Front), 118 App. Div. 865; Matter of City of New York [Seward Park Slum Clearance Project), 10 A D 2d 498; Rose v. State of New York, 24 N Y 2d 80); City of Buffalo v. Clement Co., 28 N Y 2d 241).
Thus it appears that the law, as long established, has clearly negated removability as the test of a fixture. Nevertheless, in this case and in every case involving fixtures tried in this jurisdiction in recent times, the city has relied on physical removability as the principal criterion of compensability. In this case, as in most other cases, it has done so in misapplied reliance on the Matter of City of New York (Whitlock Ave.) case (278 N. Y. 276) in which the Court of Appeals, after finding a failure of proof with respect to adaptability and intention of permanence, held that the readily removable looms claimed by the *872 tenants in that proceeding were not compensable as fixtures. Despite the total rejection of its theory in case after case, the Corporation Counsel persists in the futile repetition of the argument that all removable fixtures are per se personal property. In face of the recent decisions in Rose v. State (supra); Cooney Bros. v. State of New York (24 N Y 2d 387) and Marraro v. State of New York (12 N Y 2d 285), the time has surely come for the city to lay this ancient ghost to rest and in the future to adapt its legal posture to conform to its responsibilities to all parties including the court.
The overwhelming proof in this case mandates the finding that on the basis of annexation (in effect conceded by the city’s installation cost items), adaptability for the special purposes of claimant’s business, intention of permanence and substantial loss of value on removal, the claimant is entitled to be compensated for the sound value in place of every claimed item of machinery and equipment contained in its appraisal.
Although the city, in the course of the trial, attempted to show that some of these fixtures were actually moved to another part of the premises subsequent to title vesting and tagged for auction sale, the claim was not proven and all items are accordingly valued as in place on the basis of reproduction cost less depreciation. This is not to say that proof of removal would have affected compensability but only that, with respect to any fixtures proven to have been removed, a different measure of damages might then have been applied in accordance with the Rose and Cooney cases (see, also, Matter of City of New York [Field’s Baking Corp.], 27 A D 2d 539 and Matter of City of New York [Aero-Chatillon Corp.], 35 A D 2d 808, revg. in part 54 Misc 2d 424; City of Buffalo v. Clement Co., supra).
It also found that claimant is entitled to a 6% engineering fee as part of “ going concern ” value as allowed by Mr. Justice Hecht in the Lincoln Square case. Adding this percentage to the city’s total reproduction cost of $888,699 brings the city’s appraisal to $942,021 as against claimant’s total reproduction cost of $945,969. The court’s finding of reproduction cost is $944,000. In conformity with Matter of City of New York (Lincoln Sq. Slum Clearance Project) (15 A D 2d 153, affd. 12 N Y 2d 1086) the same 40% physical depreciation deduction used to arrive at sound value of the structure is also applied to the fixtures on the court’s finding that in this case the useful life of the fixtures will not extend beyond the useful life of the building. Although in the second Field’s Baking Corp. case (34 A D 2d 684) the Appellate Division, Second Department, *873 factually distinguished the Lincoln Sq. Slum Clearance Project case, such distinction is not applicable here because of the difference in the age of the fixtures, the range of appraisals and the court’s findings based thereon. An award for the sound value of the fixtures is accordingly made in the sum of $566,400 for a combined building and fixture award in the sum of $1,106,400. (It is noted that both claimant and city transposed some items from building to fixtures and vice versa. However this combined method of appraisal and the adoption of the same over-all depreciation rate for building and fixtures makes such transpositions immaterial in arriving at total valuation.) Adding this sum to the land award of $258,500 results in a total award for Damage Parcel 14 rounded to $1,365,000.
damage parcel 25 is a one-story building on the southeast -corner of Third Avenue at 94th Street on a plot of the same dimensions as Damage Parcel 23. At title vesting the property was leased to a national food market chain for use as a supermarket. This leasehold ran to 1981 with an annual rental that graduated from $22,365 on vesting date to $32,115 for the last five years of the term. These rentals included a tax overage provision. Two claims are presented for determination, by the lessor for the value of the fee interest and by the lessee for the value of the unexpired term of the leasehold.
It is conceded by the experts involved in both claims that a rated tenant will usually pay less on a long-term lease than fair rental value and they have accordingly estimated rental income in excess of the actual rent pursuant to the lease. The city’s expert estimated annual gross income of $26,791 from which he deducted estimated expenses of $6,896 for estimated net income of $19,895 that he capitalized at an over-all 9% rate for a total valuation of $221,000, allocated $157,500 to land and $63,500 to building. The fee owner estimated gross income of $39,000 from which he deducted estimated expenses of $9,166 for an estimated net income of $29,834 that he separately capitalized at 6.5% for land and 12% for building. His land valuation is $359,000 and his residual building value is $54,000 for a total valuation of $413,000. His over-all rate of capitalization is 7.22%.
The court finds estimated gross income of $36,000 and estimated expenses of $8,500 for estimated net income of $27,500. In this case, in view of the wide discrepancy between building value and the much greater land value, it is doubtful that the improvement represents the highest and best use of the land. In such ease the use of the building residual technique results *874 in an artificial allocation of income to the building and is of doubtful validity. Accordingly the court has adopted the city’s approach and has applied an over-all capitalization rate of 8.5% to estimated net income for a total award of $324,000. Of this sum, the court’s award for the land, as in Damage Parcel 23, is $263,000 and the remainder of $61,000 is the award for the building.
The value to the lessee of the unexpired term of its leasehold is measured by the present worth of the excess of fair rental value, or economic rent, over the rental stipulated in the lease, or contract rent, for the remainder of the term. Various methods of capitalization can be utilized to discount this excess to determine its present worth. The simplest method and the one used by both opposing experts is the annuity, or Inwood, method of capitalization, in which a factor is applied taken from the Inwood Tables. The lessor’s expert arrived at a leasehold value of $60,639 by adopting the same economic rent as in the fee appraisal, deducting therefrom the contract rent for the four remaining periods of the lease and applying an Inwood factor of 9% to the difference. However, in computing the contract rent he added to the base rentals plus tax overage a sum for each of the periods representing the amortized cost of a modernization improvement made voluntarily by the tenant in 1967. Such addition is disallowed since contract rent cannot be sought dehors the contract. ‘ ‘ The purchaser of the lease in the open market would derive the benefit of these improvements, and, without additional expense on account thereof would, on the payment of rent reserved, have the use of the property in its improved condition; and the appraisal, in condemnation proceedings, in the tenants ’ interest should proceed on this basis ’ ’ (Matter of City of New York [Fairfield Trust], 19 A D 2d 44, 47).
The lessee’s expert found a leasehold value of $94,000, arrived at by estimating economic rent at $40,500, contract rent as stipulated in the lease and an Inwood coefficient of 8%.
The court adopts $36,000 as the economic rent, deducts therefrom the rental plus tax overage for the balance of the lease and capitalizes the excess at an Inwood factor of 8% for a leasehold valuation of $60,000 to be paid to the lessee out of the award to the fee claimant. The court makes this leasehold award fully cognizant of the fact that the amount thereof is less than the valuations of both experts. However it must be pointed out that the economic rental adopted by both experts in this leasehold claim is in excess of the estimated rental found by the court in fixing the fee award herein and that rental *875 necessarily must be the economic rent adopted by the court in fixing the value of the unexpired term of the leasehold.
The court would he remiss if it concluded this decision without expressing its appreciation to all counsel in this proceeding for their expert advocacy and for the excellence of the briefs submitted by them in this lengthy trial that were of considerable aid to the court.