James S. Brown, J.
Among the parcels acquired by the city in this condemnation proceeding was Damage Parcel No. 47 consisting of a concrete floored, high ceilinged, fireproof loft building at 749 Atlantic Avenue, Brooklyn. When title vested on May 15, 1969, it was rented out to various tenants, including one Peerless Tree Lite Co., whose fixture claim is the subject of this decision.
On title vesting date, this company, which had been a tenant for 21 years under a series of leases, occupied some 50,000 square feet on several floors. The business was 45 years old and had been owned and operated for some time by a corporation owned by two individuals, a father and son-in-law. The father, the president, died during the course of this trial. The son-in-law, Ira Ehrensall, the secretary-treasurer and plant manager, testified at great length during the trial as to the function of the *172 various machines, their construction and ages, manner of annexation to the real estate, and other details in the setup of the plant and the running of the business.
The copies of the claimant’s income tax returns for the 12 years immediately preceding the condemnation, that is, 1958 through 1969, show that the gross annual business averaged over $1,600,000 and the annual net profit after substantial compensation to each of the two principals was large. For example, for the fiscal year ending July 31, 1969, when the gross business was $1,531,109 and the salaries of the two principals were $70,373, there was a taxable profit of $23,207; and for the following year, the fiscal year ending July 31,1970, when the gross business was $1,643,724 and the salaries of the two principals were $89,800, there was still a taxable profit of $164,060.
About 80% of the company products consisted of Christmas tree light outfits. The bulbs were all purchased from outside, 90% from Japan. The wire strings were cut to size. The sockets (husks), cap-on plugs and add-on plugs of each string were molded in the plant from bakelite powder bought in carload lots. These strings were in different sizes to accommodate 7, 15 or 25 lights, some for indoor use and others for outdoors.
Several machines, most of which were devised and custom-made right in the plant, were used in the manufacturing process. Some were very sensitive and delicate, with tolerances up to 16/1000 of an inch, and were conceded by the city machinery expert to be “unique.”
It was obviously an active, integrated plant, with some machines operating 24 hours a day, 7 days a week. Approximately 15,000,000 light sockets were turned .out annually. In addition to Christmas tree lights, there were other miscellaneous products including ‘‘ candeliers, ’ ’ cellophane Christmas wreaths, etc. The year-round number of employees averaged between 100 and 110 persons.
THE APPRAISALS
This claim originally covered 72 items but two, Nos. 26 and 27, were withdrawn at the time of trial.
The claimant’s appraiser, Morris Jacks, made an amended appraisal, dated May 12, 1972, which, he testified, followed the format required by Rose v. State of New York (24 N Y 2d 80), and wherein he added 10% for an engineering fee and allocated a separate depreciation to each item. He then deducted from the total the valuations he had given to the omitted items, Nos. 26 and 27. The net sound value of all the items remaining totaled $286,833.
*173 An appraisal for the city by Gilbert J. Wright lists the following values under Schedule A for ‘ ‘ compensable items not capable of being removed ’ ’; replacement cost $19,139; sound value $16,961. These items consist of piping and wiring referred to below whereby the machinery and equipment were annexed to the real estate.
Under his Schedule C, he lists the rest of the items on an “ if compensable basis.” The totals of his six columns are:
(1) Replacement cost.................................... $242,850 (2) Sound Value........................................ 162,478 (3) Salvage value..........................,............ 77,195 (4) Sound value less salvage value........................ 85,283 (5) Cost of disassembly, trucking and reassembly........... 6,595 (6) Lower of column (4) or (5)........................... 6,282 [sic]
However, since the claimant has elected to abandon all the items, the last four columns numbered (3), (4), (5), and (6) become irrelevant for the purpose of valuation.
With regard to total sound value, Mr. Wright admitted that he might have overlooked one mold with a sound value of $8,667 and if that were added to his appraisal, this total sound value would be increased from $162,478 to $171,145.
The city has also submitted two separate appraisals of “ fixtures ” by Richard Cohen. The first lists on an “ if compensable ” basis 10 items (numbered 13, 14, 15, 16,17,18,19, 20, 22, and 23) to which he gives a sound value of $1,123. He also lists separately as compensable 5 other items (numbered 21, 35, 38, 39, and 43) to which he gives a sound value of $2,633. The second appraisal, which he calls a “ Supplemental” appraisal, lists some additions to item 35, and increases the sound value of his 5 items of compensables from $2,633 to $3,056.
In short, the sound values placed upon all the items by the city’s appraisers, Wright and Cohen, whether categorized as compensable, or “if compensable,’’ or personal property may be summarized:
Wright’s appraisal — originally............................... $162,478 Added mold................................................ 8,667 $171,145 Cohen’s ■— if compensables........................... $1,123 “ —compensables............................. 2,633 " —added compensables....................... 423 4,179 $175,324
This also includes $24,000 allowed by Wright as the sound value of the printing plates (item 71) labeled by him as “ Personal Property.”
*174 AS TO THE LAW ON FIXTURES
On the question of compensability, the city adopts the same attitude it has assumed on all fixture claims and that is, that an item of machinery or equipment which can be moved without substantial damage to it or the freehold is personal property and not compensable.
That is not the law of New York and never was. As far back as McRea v. Central Nat. Bank (66 N. Y. 489) the New York courts have held to the contrary. In that 1876 ease the court pointed out (p. 496) that the criterion of a fixture is “ The union of three requisites First. Actual annexation to the realty or something appurtenant thereto. Second. Application to the use or purpose to which this part of the realty with which it is connected is appropriated. Third. The intention of the party making the annexation to make a permanent accession to the freehold ” and added (p. 498): “ the slightest fastening will be sufficient to constitute annexation ”; if the second of the above requisites is present.
Time and again it has been held that the force of annexation relates only to the question of intention of permanence, absent any other proof or presumption of intention of permanence. In Rose v. State of New York (24 N Y 2d 80, supra) it was also pointed out that the force of annexation was but one test, a specifically designed building being another, and a loss of substantial value to the fixture on removal being another.
In Jackson v. State of New York (213 N. Y. 34, 35-36 [1914, Cardozo, J.]) the court said: “It is intolerable that the State, after condemning a factory or warehouse, should surrender tq the owner a stock of second-hand machinery and in so doing discharge the full measure of its duty. Severed from the building, such machinery commands only the price of second-hand articles; attached to a going plant, it may produce an enhancement of value as great as it did when new. The law gives no sanction to so obvious an injustice as would result if the owner were held to forfeit all these elements of value.”
In United States of Amer. v. Certain Property (344 F. 2d 142, 150 [1965]), the court stated: “But, just as it is intolerable that the state, after condemning a factory or warehouse, should surrender to the owner a stock of second-hand machinery and in so doing discharge the full measure of its duty, ’ Jackson v. State, supra, 213 N. Y. at 35, it would be nearly as intolerable that the Government should foist on tenants a portion of machinery which had been specially constructed or purchased for use *175 in the premises taken and will lose a large measure of its value if removed for use elsewhere.”
In the first of two decisions by the Appellate Division, Second Department, in the Matter of City of New York (Field’s Baking Corp.) case (27 A D 2d 539, 540), the court said: “ the fact that the machines and fixtures can in fact be removed does not of itself affect their permanence for compensation purposes, so long as the test for classifying them as compensable fixtures is otherwise satisfied. Some of the twine factory machines in the McRea case were removable, as was almost all of the equipment in Jackson v. State of New York (213 N. Y. 34).”
As to what is or what is not a fixture, the decision in Rose v. State of New York (24 N Y 2d 80, 85-87) summarizes the applicable law, viz.: “ The law of fixtures was evolved by the judiciary in order to ameliorate the harsh result to those who substantially improved property but who had less than a fee interest. (See, e.g., McRea v. Central Nat. Bank, 66 N. Y. 489; McKeage v. Hanover Fire Ins. Co., 81 N. Y. 38; Herzog v. Marx, 202 N. Y. 1.) The rules, when applied in an eminent demain proceeding, protect the owner of this type of property from being deprived of compensation when the land upon which they are situated is condemned. (See, e.g., Matter of City of New York [Allen St.], 256 N. Y. 236; Matter of City of New York, 192 N. Y. 295; Matter of Mayor of City of N. Y., 39 App. Div. 589.)
“ New York takes a broad view in evaluating what improvements are to be regarded as fixtures. Not only is machinery deemed a fixture where it is installed in such manner that its removal will result in material injury to it or the realty, or where the building in which it is placed was specially designed to house it, or where there is other evidence that its installation was of a permanent nature ’ (Matter of City of New York [Whitlock Ave.], 278 N. Y. 276, 281-282; see, e.g., Matter of City of New York [Allen St.], 256 N. Y. 236, supra), but also those improvements which are used for business purposes and which would lose substantial value if removed (City of Buffalo v. Michael, 16 N Y 2d 88; Marraro v. State of New York, 12 N Y 2d 285; Matter of City of New York [339 Grand St. Corp.], 10 AD 2d 498).
“ This formulation of the rules permits equitable treatment of the owner of fixtures. It signifies a recognition of the obvious realities confronting the business community. Modern business, in order to produce goods and services, invests heavily in cumbersome and complicated machinery which, because of the manner of its installation, can only be removed with difficulty. This *176 approach to the problem of fixtures, however, recognizes that on occasion these structures can be profitably removed to another location and used by the' owner. This will occur when the machine is specially adapted to the owner’s particular needs or when the owner cannot be assured of a favorable delivery because of his manufacturer’s lag time and, therefore, must remove the fixture to his new location in order to start production promptly. On these occasions, however, these items can only be moved normally at inordinate expense and, therefore, it would be inequitable to treat these items as personalty simply because of the possibility of removal at less than total destruction of the machine or the structure which houses it.
“Nevertheless, in attempting to deal fairly with claimants who are seeking compensation for the loss of fixtures, we must.,, not lose sight of what the State’s precise responsibility is in the field of compensating those property owners who have suffered losses because of the State’s exercise of the power of eminent domain. The constitutional requirement of compensation mandates that the property owner be indemnified so that he may be put in the same relative position, insofar as this is possible, as if the taking had not occurred. . (See Livingston v. Mayor of City of N. Y., 8 Wend. 85; Banner Milling Co. v. State of New York, 240 N. Y. 533; Matter of Board of Water Supply of N. Y., 277 N. Y. 452; New York, O. & W. Ry. Co. v. Livingston, 238 N. Y. 300.) Just compensation is properly measured by determining what the owner has lost (St. Agnes Cemetery v. State of New York, 3 N Y 2d 37, 43).”
In its later decision in Cooney Bros. v. State of New York (24 N Y 2d 387), the Court of Appeals reiterated what it had said ' in the Bose case as to compensation for machinery and fixtures.
In the Matter of City of New York (Ruppert Brewery) case (67 Misc 2d 863, 871-872) the same contention by the city about “ movability ” was encountered and the court at Special Term (Fine, J.) pointed out: “The city’s expert testified that, as instructed by the Corporation Counsel, his category of ‘ if compensable ’ items includes all machinery and fixtures that he found could be removed without material injury to itself or to the structure. Nevertheless, with the exception of two minor items, he found the installation cost of all of such items compensable.
“ The basic law of fixtures and the criteria to determine their compensability in condemnation proceedings have been firmly established for over a century (McRea v. Central Nat. Bank of Troy, 66 N. Y. 489). No useful purpose would be here served by still another lengthy exposition of the genesis of the *177 oft confirmed proposition that ‘ annexation, adaptability, and intention of permanence convert machinery into a fixture, regardless of removability ’ (Matter of City of New York [Lincoln Sq. Slum Clearance Project], 24 Misc 2d 109, 202, mod. on other grounds, 15 A D 2d 153, affd. 12 N Y 2d 1086). In the application of this threefold test, the all important criterion of intention of permanence ‘ is readily presumed in the case of an owner where (as here), he installs machinery in a building which is especially suited for that purpose, and with the object of carrying on his business therein ’ (p. 196). A more recent and additional basis of compensability applies to items that would lose •substantial value if removed even though readily removable (Jackson v. State of New York, 213 N. Y. 34; Matter of City of New York [North Riv. Water Front], 118 App. Div. 865; Matter of City of New York [Seward Park Slum Clearance Project], 10 A D 2d 498; Rose v. State of New York, 24 N Y 2d 80; City of Buffalo v. Clement Co., 28 N Y 2d 241 [decided April 8,1971]).
‘ Thus it appears that the law, as long established, has clearly negated removability as the test of a fixture. Nevertheless, in this case and in every case involving fixtures tried in this jurisdiction in recent times, the city has relied on physical removability as the principal criterion of compensability. In this case, as in most other cases, it has done so in misapplied reliance on the Matter of City of New York (Whitlock Ave.) case (278 N. Y. 276) in which the Court of Appeals, after finding a failure of proof with respect to adaptability and intention of permanence, held that the readily removable looms claimed by the tenants in that proceeding were not compensable as fixtures. Despite the total rejection of its theory in case after case, the Corporation Counsel persists in the futile repetition of the argument that all removable fixtures are per se personal property. In face of the recent decisions in Rose v. State (supra); Cooney Bros. v. State of New York (24 N Y 2d 387) and Marraro v. State of New York (12 N Y 2d 285), the time has surely come for the city to lay this ancient ghost to rest and in the future to adapt its legal posture to conform to its responsibilities to all parties including the court.”
ITEM 71 (PBIimnG plates)
This item appears in the appraisal of Mr. Jacks dated August 24, 1971 and in his later long-hand amended appraisal dated May 12, 1972. In the August, 1971 appraisal he gave this item a “ Field Cost ” of $36,500. In the later appraisal he gave it a “ Cost of Reproduction ” of $40,150, and after deducting depreciation of $18,067 (45%) reached a “ Sound Value ” of $22,083.
*178 On the other hand, the city appraiser (Wright), who labels • the item as “Personal Property,” gives a replacement value on an “if compensable” basis of $36,000 and sound value of $24,000.
The testimony of Ira Ehrensall, the claimant secretary-treasurer and plant manager, contains the following references to this item: “Item 71 are printing plates necessary for our various boxes which we boxed our sets in * * * An artist would make designs for us, of which there would be engravings made and then plates, electrolight plates and we could take these plates to any box maker and * * * he could make our boxes. * * * Each manufacturer has his own plates, his own boxes. * * * The box will differentiate your line from another one ’s line although you have different husks and different methods. * * Actually, the box man takes care of the mechanics of this * * * I don’t know when we made our last plate but you are constantly making new plates or new boxes. Either you are making your old boxes or you are making new items. * * *
“ Normally you keep your plates with the box maker that’s running your boxes. They are your property, and if you desire to switch to a different box maker, he will deliver these plates to you or to your new box maker to run your boxes. * * *
“ On title vesting date- — that’s in 1969 — they were still at the box maker. ’ ’
Although the examination of this witness, Ehrensall, was continued two weeks later and again a month after that, no further reference to these plates was made, and no documentary proofs were brought in or offered in reference thereto.
The 250 pages of testimony of claimant’s appraiser Jacks contain no reference to this item although his amended appraisal gives it the afore-mentioned sound value of $22,083.
There is also no reference to this item in the testimony of the city’s expert (Wright) and there is nothing in the record to justify his replacement cost of $36,000 and his éstimated sound value of $24,000. The record fails to establish that either of the experts ever saw these 73 plates. No plate was produced in court and no plate maker or box maker was produced. In short, the record is entirely barren of any basis for said valuations given by both experts. They are entirely unsubstantiated and, therefore, worthless to the court (Getty Oil Co. v. State of New York, 33 A D 2d 705; Fonda, Johnstown & Gloversville R. R. Co. v. State of New York, 29 A D 2d 240; Fredenburgh v. State of New York, 26 A D 2d 966; Katz v. State of New York, 10 A D 2d 164). This latter case involved land and ‘ ‘ improve *179 ments,” including the fixtures of a garage and service station. There the court said (p. 166): ‘ ‘ The experts for the State arrived at a total valuation of $181,100. The record indicates that they made a comparatively cursory inspection and examination of the premises and improvements. Their testimony was considerably weakened by admissions made on cross-examination. No clear foundation or factual support for the opinion valuation appears. A mere opinion without factual support is not entitled to great probative force.”
Furthermore, even if a basis for valuation had been established, this court finds on all the evidence that these plates were personal property and not compensable. They were not part of any machine or fixture in the claimant’s plant, as were the molds and dies hereinafter discussed. Accordingly, no award is made for this item.
ITEM 72 (work in progress)
The claimant’s appraiser lists “Work in Progress” at a “ Field Cost ” of $23,644. He testified he got that figure from the claimant. In his revised appraisal he increased that amount to $26,008.
The witness Ehrensall, the plant manager, described “ Work in Progress ” as meaning “ parts that were not complete that we had been manufacturing at the time. They were not complete units when we stopped manufacturing. It wasn’t a sale-able item ”. He also stated that no inventory was taken in May, 1969 and that the work in progress estimate ($26,008) was made by him “ after December 1970 ”. • This was when the claimant stopped manufacturing, 19 months after title vesting. There is one list headed ‘ work in progress ’ ’ which is undated.
It is all too obvious that any incomplete work on hand in May, 1969 must have been completed in due course before the plant closed down 19 months later. This is borne out by the income tax returns showing the plant did a very substantial business in the fiscal years ending July 31,1969 and July 31,1970.
The city’s appraiser labels this “Work in Progress” as “ Personal Property ” and “ Part of Inventory ” and gives it no compensable value. This court agrees and finds it noncompensable and makes no allowance for that item.
COMPENSABILITY AS TO THE REMAINING ITEMS
It is undisputed that the claimant abandoned its machinery and equipment. It stopped manufacturing in December, 1970 and has no intention of going back into business.
Nevertheless, the city not only assumes the attitude that all the items are movable and therefore noncompensable but also con- *180 lends that even if compensable, this claimant ‘ ‘ in mitigation of damages ’ ’ was obliged to dispose of them.
The colloquy on that was as follows: “ mb. levy: It is the city’s contention that all of the items that the City deemed as movable, the City does have the Rose format, [sic] It is the City’s contention that the claimant is under a duty to mitigate his damage, and if he is able to remove certain items that the City has designated as movable items the City does have an appraisal in conformity with Rose. q
‘ ‘ the coubt : When do you say the owner is obligated to move whatever he can? Where do you get the law for that?
“ mb. levy: This is the interpretation that the Corporation Counsel places on Rose and other Court of Appeals cases on fixtures.”
The court does not agree with this interpretation although it is well aware of the decision of the Court of Appeals of April 8. 1971 which was later than the Rose decision (City of Buffalo v. Clement Co., 28 N Y 2d 241, 261), wherein it was said (Scileppi, J.): “ And, as the State is not required to place a claimant in a better position than he was prior to the taking, we have established a rule of damages which limits compensation to either in-place value or removal costs, whichever is less (see Rose v. State of New York, 24 N Y 2d 80, 88, supra). That rule imposes upon the condemnee the obligation of mitigating damages or suffering the consequences of his failure to do so, and his efforts to redress his damages by removing the fixtures to a new location, under the circumstances, should not work to deprive him of his right to be made whole.” The court has reviewed the Rose case again and cannot find any rule therein Avhich imposes upon a condemnee the obligation to -remove fix-lures in order to mitigate damage.
When a factory i§ taken in condemnation, it is equivalent to a forced sale of the fixtures with the city as the buyer. The law does not compel the o-wner to disassemble and remove his machinery and equipment classifiable as fixtures. The option of removal remains with the o-wner. When he removes his fixtures, he is entitled to be paid reasonable moving expenses or the difference between salvage value and present value in place (reproduction cost less depreciation), whichever amount is lower. If he abandons his fixtures, he is entitled to be paid the present value in place.
As stated above, items 26 and 27 have been withdrawn and the court has found items 71 and 72 to be personal property and not compensable.
*181 Upon all the evidence and the law, the court finds the remaining 68 items compensable and awards therefor the amounts set forth in the annexed schedule, totaling $209,167.
Those amounts are inclusive of a 10% engineering fee. The , claimant’s machinery expert added 10% overall for engineering fee and gave testimony as to why such a fee should be added. Such fees have been approved under similar circumstances (Matter of City of New York [Lincoln Sq. Slum Clearance Project], 24 Misc 2d 190, mod. 15 A D 2d 158, affd. 12 N Y 2d 1086). The court finds the inclusion of an engineering fee justified and awards 1.0% for said fee.
The schedule reflects the fact that wherever the appraisers are not too far apart, the court in fixing its award adopted a mean value.
Where there are big disparities, the court sets forth its observations and explains its findings in the following footnotes:
ITEMS 11a, 11b and 11c
These are three custom-made insertion machines which the city has appraised as having a combined reproduction cost of $37,345 and a combined sound value of $24,897. The claimant gives them a reproduction cost of $65,340 and a sound value of $49,659.
In explaining his valuation, the city appraiser stated that after estimating the cost of the component parts of these intricate machines, he added 100% for labor. At one point he stated: “ It is a hypothetical way of arriving at a value because there is so much trial and error.”
The claimant’s appraiser’s testimony impressed the court as being more accurate and painstaking. Accordingly, the court fixes its award at $45,000 for these three items.
ITEMS 13 THROUGH 23, INCLUSIVE,
58, 59, 60, 61 and 63
Claimant’s appraiser grouped 13 to 23, inclusive, and gave them a total reproduction cost of $2,613 and a total sound value of $1,960. However, his appraisal lists these items as “ Piping and Wiring only.” Part B of his appraisal separately lists the tables involved in this group and gives them a reproduction cost of $3,603 and a sound value of $2,706.
Parenthetically, the proofs indicated that these were not just ordinary tables but were custom-made platforms up to 16 feet long constructed to accommodate some of the machine combinations. This appraisal refers to items 58 and 59 as equipment while the city appraiser includes items 60, 61 and 63 as part of *182 this grouping. Item 58 is actually a group of 24 eyelet machines to which claimant’s appraisal gives a reproduction cost of $27,931 and a sound value of $21,228. Item 59 is a group of four other machines to which it gives a reproduction cost of $4,752 and a sound value of $3,089. To summarize these rather confusing figures, they boil down to this:
Claimant’s Appraisal: Items 13-23 — Piping, etc.. “ 13-23 — Tables...... “ 58 — 24 Machines “ 59 —4 Machines.. “ 60.................. “ 61.................. “ 63.................. City’s Appraisals: (Wright) Item 13...................... “ 14...................... “ 15...................... “ 16...................... “ 17...................... “ 18...................... “ 19...................... “ 20...................... “ 21 “ 22...................... “ 23 “ 58 “Part of Ítem 1.3”..... “ 59 “Part of Item 14” “ 60 “Part of Item 13” “ 61 “Part of Items 17 & 18” ^production Cost Sound Value $2,613 $1,960 3,603 2,706 27,931 21,228 4,752 3,089 143 93 214 140 594 386 $39,850 $29,602 $20,220 $13,480 2,814 1,876 1,548 1,161 280 210 205 154 80 60 1,200 900 200 150 500 375 800 334 $27,847 $18,700 (Cohen) Reproduction Sound Cost Value Item 13..................... .................... $400 $280 14..................... ................... 90 62 « 15..........;.......... 35 tt 16..................... ................... 50 35 {( 17..................... ................... 85 51 {< 18..................... ................... 70 49 U 19..................... ................... 420 295 i( 20..................... ................... 225 158 a 21..................... 193 a 22...................... .................. 50 ' 35 a 23..................... ................... 175 123 $1,890 $1,316
Upon all the evidence, the court awards the amount of $25,000 for all of the above items.
ITEM 48
This is described in the claimant’s appraisal (by Jacks) as
*183 Reproduction Sound Cost Value “48 — Electrical Throughout”.................... $25,362 $16,463
In his testimony he described how he reached these valuations which, incidentally, are even less than those of the city’s appraiser (Wright), whose appraisal sets forth these items this way:
Schedule A — Compensable Items not capable of being removed (In the schedule there are 67 separate items)....................................... 19,319 16,961 In his Schedule B of “If Compensable” items he also has “48 — Miscellaneous fluorescent light fixtures — Personal Property”......................... 1,522 1,218 $20,841 $18,179
Since the city’s valuation for Schedule A alone is higher than the claimant’s, the court awards $16,463 for this item.
VALUATION or MOLDS (ITEMS 56 AND 57) AND DIES (iTEM 65)
The molds come in two halves, one upper and one lower, each half weighing about 400 pounds. They could not be used by anyone else. They were painstakingly made of steel with great precision and cost up to $13,000 each. Some were used 24 hours a day, seven days a week, for an entire year. They could not be installed or moved without the aid of a hydraulic press and a die buggy. It took up to one week to set a mold in place on a molding press and it then remained on the press indefinitely. They were guaranteed for some 8,000,000 to 10,000,000 ‘ shots ’ \
No one of them could perform any function by itself, independent of the molding press of which it became a part. The pressure of the press ran up to 50 or 75 tons.
The function of the dies was explained by the witness D’Angelo: “ Once a die is made to cut a certain brass, that’s also fabricated for that particular size and shape of what’s coming out of there and it cannot be altered. You can’t use those dies for anything else but your item. That’s all tailor-made equipment. ’ ’
This court finds these molds and dies to be compensable, as part of the machines which they supplemented. There was a “ constructive annexation” here as defined in American Law Reports (109 A. L. R. 1424, 1425), and the cases therein cited, viz., Haggert v. Town of Brampton ([1897] 28 S. C. Rep. 174) and Atlantic Refining Co. v. Feinberg (31 Del. 183 [1920]). In the latter case the court said (p. 188): “ If any substantial part of the complete equipment necessary for the use of the chattels in question was fastened or attached to the freehold *184 in a permanent manner, then all is to be considered as so attached, and also everything used in working it.” (Emphasis supplied).
The witness Jacks testified that his “ field cost ” of the molds and dies ‘ ‘ was based upon original bills on the molds and we had a transcript on the dies, I believe ” listed on a sheet furnished by claimant and he found the costs therein set forth to be reasonable.
Some of the bills he evidently had reference to were:
Exh. No. Invoice Date Article Amount CL 23 6/28/62 CL 24 6/1/62 CL 25 1/31/64 CL 26 2/16/62 2'LCavity Mold $11,000 32-Cavity Mold 13,200 12-Cavity Mold 5,680 12-Cavity Mold 4,500
He also testified that in his amended appraisal he increased the value of item 56 from $13,750 to $30,745, and that this was due to additional invoices found; and that he took the 1962 cost of $24,596 and added increment thereon to the title vesting date in 1969, and thus reached his value of $30,745. He also stated that the molds in item 57 were separate from those in item 56, and that page 12 of Exhibit 27 showed how he priced the dies.
The record indicates that one mold had evidently been overlooked by both sides, and on cross-examination the city’s expert, Wright, testified:
Q. Do you think that a $13,000 replacement cost for the 32-cavity mold and the 24-cavity mold as of the date of taking is a reasonable replacement cost for those molds?
A. Not in view of these invoices, no.
Q. What do you think is a reasonable replacement value for these two molds?
A. Well, I would say double it.
Q. What would you say was the reasonable sound value of those molds, of the 32 and 24?
A. The same arithmetic would apply on this, too.
Q. What figure would you say would be the reasonable value?
A. About $17,334, somewhere around that.
Q. Coincidentally the same sound value that you have —
A. Coincidentally the same as 57, yes.
Q. So it is roughly doubled the mold that you had?
A. Yes.
Q. Bearing in mind this new information about the additional invoices, would you care to change your opinion of the sound value in your entire Schedule C ?
me. levy: I did make a prior objection to the introduction, and Mr. Wright made an appraisal based upon what he had *185 seen and what he had inspected on Mr. Jacks’s appraisal. If there is sufficient proof that there was an additional mold, I am sure that Mr. Wright would amend his appraisal to reflect it.
the court : I will still take it. It is proper cross-examination.
the witness : I have indicated such.
Q. What’s your total then?
A. Well, you would add another $8,667 to the sound value.
Q. Which is $162,478?
A. Yes, yes.
Q. I make it $171,445.
A. I didn’t do the arithmetic.
The appraisals of the molds and dies (without the one which had been overlooked) were as follows:
Sound Value by Claimant Sound Value by City (Jacks) (Wright) Item 56.............\ $25,940 $8,667 “ 57.............. 26,180 17,334 “ 65.............. 12,305 8,667 $64,425 $34,668
After reviewing all the evidence, the court awards the sum of $50,000, which is inclusive of the overlooked mold.
SCHEDULE OF AWARDS Sound Value Sound Value Item No. by City by Claimant Award 1 $638 $1,412 $1,000 2 1,389 3,295 2,350 3 945 1,770 1,350 4 200 357 275 5 21,000 27,294 24,000 6 12,000 16,447 14,250 7 2,256 3,888 3,000 8 1,590 1,465 1,465 9 405 546 475 10 405 399 399 11A1 11B] 24,897 49,659 45,000 ncj 12 2,614 2,497 2,497 13 13,480 14 1,876 15 1,161 $25,000 16 210 As footnote ex-17 154 plains, this award 18 60 also covers items 19 900 58, 59, 60, 61 and 20 150 63 below
*186 SCHEDULE OF AWARDS Item No Sound. Value by City Sound Value by Claimant Award 25 8200 8220 $210 26 Removed ' 27 « 28 297 286 286 29 139 201 170 30 120 317 220 31 90 251 170 32\ 33/ 1,613 2,792 2,200 34 10 NVA 35 1,652 2,648 2,150 36 Bldg. Item 37 (( U 38 123 76 76 39 441 318 318 40 Incl. in Sch. A 58 58 41 “Pers. Prop.” 363 363 42 150 172 160 43 647 132 132 44 Bldg. Item 45 « (( 46 u a 47 180 308 250 48* 1,218 16,463 16,463 49 357 551 450 50 188 238 200 51 132 293 250 52 1,650 2,040 1,850 53 5,267 7,683 6,500 54 3,327 3,941 3,600 55 522 203 203 56* 8,667 25,940/ 50,000 57* 17,334 26,180/ Includes award for item 65 58* Part of No. 13 21,228 See item 13 above 59* « « « 24 3,089 See item 14 above 60* “ “ “ 13 93 See item 13 above 61* « « r< 27 140 See item 17 above 62 Could not identify 193 193 63* Part of No. 20 386 See item 20 above 64 400 388 388 65 8,667 12,305 Grouped with 56 and 57 66 100 845 475 67 107 407 250
*187 SCHEDULE OF AWARDS Sound Value Sound Value Item No. by City by Claimant Award 68 $40 $64 $50 69 40 49 45 70 24 33 30 71 24,000 22,083 Disallowed 72 Inventory 26,008 Disallowed Total $209,167